UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DEVON THOMAS

                  **Plaintiff,**                        **COMPLAINT AND DEMAND FOR A JURY TRIAL**

                                                     **Index No.  18-cv-2781**

       **-v-**

THE CITY OF NEW YORK, THE NEW YORK CITY
POLICE DEPARTMENT, THE NEW YORK CITY
POLICE DEPARTMENT LICENSE DIVISON,
JAMES P. O'NEILL, POLICE COMMISSIONER
OF THE CITY OF NEW YORK, JONATHAN DAVID,
DIRECTOR OF THE NEW YORK CITY POLICE
DEPARTMENT LICENSE DIVISON, AND
DETECTIVE JOSEPH COOK (Shield No. 6694)

               **Defendants.**
----------------------------------------------------------------X

Plaintiff, DEVON THOMAS through his attorney PETER H. TILEM, ESQ. of TILEM & ASSOCIATES, P.C., as and for his complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought to vindicate Plaintiff's rights under the Second and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, as amended, codified as 42 U.S.C. §1983, and the Civil Rights Act of 1964, codified as 42 U.S.C. §2000d.

2.      Since 1995, Plaintiff, an African American male, has held a handgun license issued by the New York City Police Department.

1

3.      In 1999 and 2008, Plaintiff was falsely arrested in New York City by members of Defendant New York City Police Department.

4.      In 2011, Plaintiff was falsely arrested in Nassau County.

5.      All three arrests were dismissed and sealed.

6.      Plaintiff was paid substantial settlements by New York City for these false arrests in New York City.

7.      In 2013, Plaintiff applied for a transfer of his Carry Guard handgun license and applied for the first time for a Gun Custodian handgun license.

8.      Plaintiff's application for a Gun Custodian handgun license was approved immediately.

9.      Plaintiff's application for a transfer of his Carry Guard handgun license denied.

10.     Plaintiff was forced to hire a lawyer and appeal the New York City Police Department License Division's arbitrary denial of the transfer of his Carry Guard handgun license because the New York City Police Department License Division considered Plaintiff's false arrests against him.

11.     Plaintiff prevailed on an appeal and his Carry Guard handgun license was issued.

12.     In early 2016, Plaintiff applied to renew his Carry Guard and Gun Custodian handgun licenses.

13.      Some months after his renewal application was approved, Plaintiff received from Defendants notification that his licenses had been revoked.

14.     After an appeal of that decision and a hearing, Plaintiff who has been licensed to carry a firearm since 1995 without any incident, as that term would be rationally understood by anyone, but Defendant New York City Police Department, has had the most serious possible

2

penalty imposed (revocation) against him, and lost his livelihood, without any grounds whatsoever.

15. Plaintiff's rights were violated when the Defendants unconstitutionally and without any rational basis revoked his Carry Guard and Gun Custodian handgun licenses.

16. By reason of the Defendants' actions, including the existence of a discriminatory policy and enforcement of said policy, Plaintiff was deprived of his constitutional rights.

17. Plaintiff also seeks an award of compensatory damages and attorneys' fees.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C §§1331, 1343(a) (3-4). This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and 42 U.S.C. §2000d for violations of the Second and Fourteenth Amendments to the Constitution of the United States. Venue is proper pursuant to 28 U.S.C. §§1931(b)(1) and (b)(2) in that Defendants are located in, and Mr. Thomas' claim arose in, the Southern District of New York.

19. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

## PARTIES

20. At all times relevant to this action Plaintiff, Devon Thomas, an African American male, was a resident of the County of Nassau in the State of New York.

21. Defendant THE CITY OF NEW YORK (hereinafter CITY) is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department and for which it is ultimately responsible.

22. Defendant the NEW YORK CITY POLICE DEPARTMENT (hereinafter NYPD) acts as Defendant CITY's agent in the area of law enforcement. Defendant CITY assumes the

3

risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

23. At all times relevant hereto, Defendant CITY, acting through Defendant NYPD, was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision and conduct of all NYPD personnel. In addition, at all relevant times, Defendant CITY was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States and the State of New York.

24. Defendant NEW YORK CITY POLICE DEPARTMENT LICENSE DIVISION (hereinafter NYPD License Division) is the entity within the NYPD responsible for approving or disapproving all applications, including renewals, of handgun licenses in New York City.

25. The CITY and the NYPD received federal financial assistance at all times relevant to this Complaint. Defendant CITY is also the employer of the individual Defendants and is a proper entity to be sued under 42 U.S.C. § 1983.

26. Defendant JAMES P. O'NEIL is the POLICE COMMISSIONER OF NEW YORK CITY POLICE DEPARTMENT, (hereinafter O'NEIL) and at all relevant times was acting in the capacity of agent, servant, and employee of Defendant CITY, within the scope of his employment as such, and acting under color of state law. On information and belief, O'NEIL, as Commissioner of NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the training, supervision, and conduct of all NYPD personnel, including the Defendants referenced herein.

27. JONATHAN DAVID, is the DIRECTOR OF THE NEW YORK CITY POLICE DEPARTMENT LICENSE DIVISON, (hereinafter DAVID) and at all relevant times was acting

4

in the capacity of agent, servant, and employee of Defendant CITY, within the scope of his employment as such, and acting under color of state law. On information and belief, DAVID, as Director of the NYPD License Division, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD License Division matters and was responsible for the training, supervision, and conduct of all NYPD License Division personnel, including the Defendants referenced herein.

28.     DETECTIVE JOSEPH COOK (Shield No. 6694) (hereinafter COOK) and at all relevant times was acting in the capacity of agent, servant, and employee of Defendant CITY, within the scope of his employment as such, and acting under color of state law was assigned to the DEFENDANT NYPD LICENSE DIVISION and is responsible for conducting investigations and determining whether to issue, deny, revoke, or reinstate handgun licenses. Defendant COOK conducted the investigation into the "incidents" surrounding Plaintiff's handgun licenses and ultimately recommended that the Plaintiff's handgun licenses be revoked.

29.     At all times relevant, the Defendants were acting under color of law in the course and scope of their duties and functions and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. Defendants acted with the power and authority vested in them under the laws of the State of New York.

## STATEMENT OF FACTS

30.     Defendant NYPD License Division, located at One Police Plaza in Manhattan, is the entity within the NYPD responsible for approving or disapproving all applications, including renewals, of handgun licenses in New York City. Additionally, Defendant NYPD License Division can suspend or revoke handgun licenses.

31.     Defendant NYPD License Division preforms its task under the regulations set forth in Title 38 of the New York City Rules. See 38 RCNY 1-01.

32.     A unit within the NYPD License Division called the "Incidents Unit," is responsible for investigating firearm license holders who are involved in an "incident".

33.     The New York City Rules do not expressly define "Incident" for the purpose of Title 38. See 38 RCNY 1-02.

34.     However, Section §5-30 of the New York City Rules, entitled "Incidents Involving Suspension" defines instances where a Licensee must immediately report occurrences to the NYPD. For instance, licensees must immediately report an arrest, summons (except traffic infractions), indictment, or conviction of licensee, in any jurisdiction, federal, state, local, or suspension or ineligibility order issued pursuant to state criminal procedure or state family court mandates. See 38 RCNY 5-30.

35.     Defendant NYPD however has a more broad definition of "Incident" and considers  any "situation" brought to their attention to be an "incident."

36.     Indeed, Defendant COOK testified at a hearing to determine the appropriateness of the revocation of Plaintiff's handgun licenses and provided the definition of "Incident" as follows:

> Hearing Officer Shields: And would you state what the License Division considers an [2:10] incident.
>
> Detective Cook: An incident is basically every licensee that's issued a license has to follow different rules governing that license, whether it's the –
>
> Hearing Officer Shields: What is an incident?
>
> Detective Cook: The incident is losing a firearm, not safeguarding a firearm. There's multiple, refile --

6

Hearing Officer Shields: And would it be accurate to say that it's an allegation of violation of any of the rules . . .

Detective Cook: Yes.

Hearing Officer Shields: Governing the permit?

Detective Cook: Yes.

Hearing Officer Shields: Or in an arrest situation?

Detective Cook: Yes.

**Hearing Officer Shields: Okay. Any other situation that comes to the attention of the License Division?**

**Detective Cook: Yes.**

See Exhibit B, Tran. 3:16-4:14. (Emphasis Supplied.)

37.    The NYPD has a policy of considering all maters brought to the attention of the Incident Unit, regardless of merit including dismissed arrests, in licensing decisions. This policy has a disparate effect on African-Americans who have a greater number of arrests dismissed by percentage than Caucasians.

38.    Indeed, according to the NYS Division of Criminal Justice Services in 2016, 23% of all arrests in the State of New York of African Americans were disposed of by dismissal or because the District Attorney's office refused to prosecute such arrests. This number is staggering when compared to a review of the dismissal or refusal of the District Attorney's Office to prosecute 11% of Caucasian arrests. See Exhibit "A" which is data compiled by NYS Division of Criminal Justice Services with respect to arrests by race.

39.    This significant fact illustrates that an arrest alone, without consideration of the disposal of such arrest, is unduly suggestive to the determination of whether an African American should be issued a handgun license or whether such license should be renewed or

revoked. This policy lacks any rationality since dismissed arrests and arrests that prosecutors refuse to prosecute are not probative of anything.

### A. THE NYPD'S HISTORY WITH PLAINTIFF

40.    Since 1995, Plaintiff, an African-American male, has held at least one handgun license issued by the NYPD, specifically by the NYPD License Division.

41.    On or about October 30, 1999, Plaintiff was driving his vehicle in Brooklyn, NY when he was pulled over by an NYPD Police Officer and placed under arrest and imprisoned without justification. Plaintiff's false arrest was dismissed.

42.    Indeed, in June 2000, Plaintiff brought an action to recover monetary damages in the Supreme Court of New York, County of Kings (Index No. 20187/00) against the CITY, NYPD, and the individual officer involved.

43.    In March 2001, Plaintiff and the City settled the lawsuit, and the City paid the Plaintiff a sum of approximately $30,000 for his false arrest.

44.    In April 2008, Plaintiff was again falsely arrested in the City of New York.

45.    In July 2008, the Court dismissed and sealed this false arrest. Plaintiff again sued the CITY and received a settlement of approximately $45,000 for his false arrest.

46.    Indeed, when Plaintiff was investigated by Defendant COOK, Defendant COOK testified:

> Mr. Tilem: Okay. Are you aware that the police department settled a wrongful arrest suit and paid Mr. Thomas money as a result of that suit?
>
> Detective Cook: No, I did not.
>
> Mr. Tilem: Did this incident figure into your decision to recommend revocation of Mr. Thomas's license?
>
> Detective Cook: The incident was one of – yes.

8

See Exhibit B, Tran. 36:23-7:6.

47.     In November 2009, Plaintiff was issued by Defendant NYPD License Division a Restricted Concealed Carry Guard Handgun License.

48.     A restricted concealed Carry Guard and Gun Custodian handgun license share a definition under the Rules of the City of New York and both licenses are defined as "restricted types of carry licenses, valid when the holder is actually engaged in a work assignment as a security guard or gun custodian." See 38 RCNY 5-01.

49.     In April 2011, Plaintiff was falsely arrested in Nassau County.

50.     In June 2011, the Nassau County District Attorney moved the Court to dismiss the Plaintiff's arrest in the interest of justice; accordingly, the Plaintiff's arrest was dismissed and sealed.

51.     In March 2012, Plaintiff applied to transfer his Carry Guard License to another company.

52.      At the same time, Plaintiff applied for a Gun Custodian handgun license.

53.     In August 2012 the NYPD License Division approved Plaintiff's application for a Gun Custodian handgun license.

54.     Yet, less than one month later, the NYPD inexplicably, denied Plaintiff's application for a Carry Guard license citing the false and dismissed arrests from 2008 and 2011.

55.     Plaintiff, who required these handgun licenses for his employment, hired this Firm to appeal the NYPD License Division's decision to deny his request to transfer his Carry Guard license.

56.     On appeal, Plaintiff's counsel correctly asserted that the arrests being considered improperly by the NYPD License Division were to be viewed in in light of New York CPL

§160.50(3) which  required that when Plaintiff's arrest history is considered, dismissed arrests are legally considered to be "terminated in favor" of the Plaintiff.

57.    After a costly appeal, the NYPD License Division granted Plaintiff's application to transfer his Carry Guard handgun license.

58.    In 2013, Plaintiff was issued by Defendant NYPD License Division, a Carry Guard and Gun Custodian license in conjunction with his employment.

59.    The original decision to grant one license and deny another license, when both licenses were applied for at the same time, is the very definition of arbitrary and capricious, lacks any rational basis, and is emblematic of the problem in the NYPD License Division.

**B.   THE 2017 ARBITRARY AND CAPRICIOUS REVOCATION OF PLAINTIFF'S CARRY GUARD AND GUN CUSTODIAN LICENSES**

60.    On January 15, 2016, Plaintiff filed an application to renew both his Carry Guard handgun license and his Gun Custodian handgun license with Defendant NYPD, as both licenses remained integral to his employment.

61.    Defendant NYPD renewed both of the Plaintiff's licenses.

62.     On September 1, 2016, Plaintiff received a Notice of Determination that Defendant COOK of the Incident Unit recommended revocation of both Plaintiff's Carry Guard handgun license and Gun Custodian handgun license.

63.    According to Defendant NYPD License Division, Petitioner's handgun licenses were revoked for four reasons: (1) the alleged facts surrounding an incident on 04/21/2016 where Plaintiff allegedly failed to follow the rules of the License Division (Title 38); (2) Plaintiff's alleged failure to notify the License Division that Petitioner was the recipient of a criminal court summons and that an Order of Protection was issued against Plaintiff; (3)

10

Plaintiff's history of arrests and incidents; and (4) Plaintiff's alleged failure to abide by the Rules and Regulations governing his firearm licenses.

64.    On or about September 22, 2016, Plaintiff hired this Firm and appealed Defendants' decision to revoke both of his handgun licenses.

65.    On February 1, 2017, Plaintiff was notified that a hearing would take place on February 15, 2017.

66.    On February 15, 2017, Defendant NYPD held a hearing to determine the appropriateness of the NYPD License Division's previous decision. See Exhibit "B" which is the complete transcript of the hearing.

67.    Only Plaintiff and Defendant COOK testified at the hearing. See Exhibit "B", Tran. 3:1-5.

68.    Even a cursory review of Defendant NYPD License Division's hearing reveals a severely deficient investigation which elicited no evidence to support the NYPD License Division's decision to revoke Plaintiff's handgun licenses.

69.    The NYPD License Division purported to conduct an investigation into "incidents" surrounding Plaintiff's handgun licenses; however, the result was an "investigation" devoid of any actual investigation.

70.    Defendant COOK was assigned to investigate the "incidents" concerning Plaintiff; however, his testimony at the hearing reveals an "investigation" fraught with inaccuracies and which failed in even the most basic steps, such as reviewing Plaintiff's applications, including the most recent 2016 renewal applications.

71.    Defendant COOK did not even make a phone call to verify the contents of Plaintiff's application for his handgun license renewals. See Exhibit "B", Tran. 27:1-10.

72. Indeed, the entirety of Defendant COOK's "investigation" about this "incident" or any "incident" lacked verification from any eyewitness to these alleged incidents. See Exhibit "B", Tran. 27:1-10.

73. Defendant COOK merely relied on computer printouts without verifying that the information contained therein was accurate and Defendant COOK failed to even view the original applications and the existence of any original documentation. See Exhibit "B", Tran. 33:24-34:21.

74. Shockingly, Defendant COOK testified that he considered the number of "incidents" reported to the NYPD License Division and not necessarily the quality or legitimacy of those incidents.

75. Even the hearing officer seemed shocked by that revelation and attempted to rehabilitate Defendant COOK's answer. However, Defendant COOK stuck to his testimony:

> Mr. Tilem: So when you considered incidents, would it be fair to say that you considered the number of incidents whether or not they were openly found to be a violation of Mr. Thomas's license?
>
> Detective Cook: The number – whether the license is continued, suspended, or revoked the incident itself is something that comes into play with whether a license is going to be –
>
> Mr. Tilem: Okay.
>
> Detective Cook: -- revoked or not.
>
> **Mr. Tilem: So just so if I can understand what you're saying. I'm not trying to twist your words. I just want to make sure I understand it. It's the number of incidences and not necessarily what the result of your – of the investigation is, correct?**
>
> **Detective Cook: That is correct.**

12

> Hearing Officer Shields: Really? You're not – you're not suggesting that if somebody had eight incidents and they were cleared of all eight of then, that you would be holding that against them are you?
>
> **Detective Cook: I would take it into account of my final decision, yes.**

See Exhibit "B", Tran. 34:4-35:3. (Emphasis Supplied).

76.     Indeed, the Administrative Law Judge again tried to rehabilitate Defendant COOK's testimony; Defendant COOK did not waiver and testified as follows:

> Hearing Officer Shields: You just told counsel that you would consider the number rather than the quality.
>
> Mr. Tilem: Right. And I think he's confirmed it.
>
> Hearing Officer Shields: That was the question. Is that what –
>
> Detective Cook: Again, you're asking me would multiple incidents be considered in the favor of my final recommendation, yes.
>
> **Mr. Tilem: Okay. Regardless of the outcome of those incidents, correct?**
>
> **Detective Cook: Regardless of the outcome, yes.**

See Exhibit B, Tran. 4:4-17. (Emphasis Supplied.)

77.     After "investigation", Defendant COOK decided to revoke Plaintiff's handgun licenses based on **"two individual occurrences, multiple incidents, just the licensee's past, past record with incidents . . ."** See Exhibit "B", Tran. 18:18-19:4. (Emphasis Supplied.)

78.     The Administrative Law Judge concluded that revocation of Plaintiff's handgun licenses was appropriate.

79.     In her decision to revoke Plaintiff's handgun licenses, the Administrative Law Judge also considered Petitioner's history of dismissed, false arrests.

13

80.     Specifically, making no finding as to these false arrests, the Administrative Law Judge recognized that the NYPD License Division was aware of these false arrests when Plaintiff's 2013 licenses were issued.

81.     The Administrative Law Judge had the ability to correct Plaintiff's wrongs by overturning Defendant COOK's decision to revoke but she failed to do so.

82.     Moreover, Defendant DAVID rubber stamped this decision and upheld the determination that revocation of Plaintiff's handgun licenses was a proper remedy.

83.     Plaintiff has also filed an Article 78 action (bearing Index No. 151785/2018) in state court to annul and vacate Defendant NYPD License Division's arbitrary and capricious decision and to reinstate Plaintiff's handgun licenses.

### FIRST CLAIM
### RACIAL DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1981
### (Against All Defendants)

84.     Mr. Thomas incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

85.     42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

86.     Plaintiff in this action is a citizen of the United States and all of the Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

87.    All individual Defendants to this claim, at all times relevant hereto, were acting under the color of law in their capacity as NYPD Police Officers and their acts or omissions were conducted within the scope of their official duties or employment.

88.    At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

89.    Title 42 U.S.C. § 1981("Section 1981") provides, in pertinent part:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

90.    Plaintiff, as an African American, is a member of a protected class, and thus also had the clearly established statutory right under this provision of 42 U.S.C. § 1981 to be free from discriminatory decisions and policies that prevent him from exercising his constitutional rights.

91.    Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

92.    Plaintiff's race was a motivating factor in the decision to revoke Plaintiff's handgun licenses based upon trumped up and dismissed arrests. Defendants' conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment and § 1981.

93. Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Mr. Thomas' federally protected rights.

94. The acts or omissions of all individual Defendants were moving forces behind Plaintiff's injuries.

95. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

96. Defendants are not entitled to qualified immunity for the complained of conduct.

97. The Defendants to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff.

98. As a result of the foregoing, Mr. Thomas was deprived of his liberty, had his Carry Guard and Gun Custodian handgun licenses revoked, and on information and belief, Plaintiff may suffer lost future earnings and impaired earning capacity and has been forced to bear costs and expenses, and was otherwise damaged and injured.

99. In addition to compensatory damages, Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

## SECOND CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. §1983
### (Against Individual Defendants)

100. Mr. Thomas incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

101. 42 U.S.C. § 1983 provides that:

16

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

102. Plaintiff in this action is a citizen of the United States and all of the individual Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

103. All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law in their capacity as NYPD Police Officers and Officials and their acts or omissions were conducted within the scope of their official duties or employment.

104. Under the color of state law, the CITY, the NYPD, the NYPD License Division, including but not limited to Defendant DAVID and Defendant COOK subjected Mr. Thomas to the foregoing acts and omissions, thereby depriving Mr. Thomas of his rights, privileges, and immunities secured by the Second and Fourteenth Amendments to the United States Constitution, including without limitation, deprivation of the following constitutional rights: (a) to keep and bear arms and (b) the enjoyment of equal protection, privileges, and immunities under the laws.

105. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the NYPD or other law enforcement agencies employing and enforcing policies which create disparate treatment among individuals based upon race and deprive individuals of their constitutional rights.

106.   Defendant COOK violated Mr. Thomas' constitutional rights by *inter alia* enforcing a policy that discriminates against African-Americans, failing to investigate allegations, failing to investigate the circumstances surrounding his false arrests, and recommending  revocation of his licenses without any basis in law or fact.

### THIRD CLAIM
### VIOLATION OF 42 U.S.C. § 1983 THROUGH DELIBERATELY INDIFFERENT POLICIES, PRACTICES, CUSTOMS, TRAINING, AND SUPERVISION IN VIOLATION OF THE SECOND AND FOURTEENTH AMENDMENTS AND IN VIOLATION OF 42 U.S.C. § 1981
### (Against all Defendants)

107.   Mr. Thomas hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

108.   42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

109.   Plaintiff in this action is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

110.   The Defendants to this claim at all times relevant hereto were acting under the color of state law.

111.   Plaintiff had the following clearly established rights at the time of the complained of conduct: (a) the right keep and bear arms, under the Second Amendment; and (b) the right to be free from discrimination by police under the Equal Protection Clause of the Fourteenth Amendment and under 42 U.S.C. § 1981.

18

112.    Defendants knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

113.    The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

114.    Defendants are not entitled to qualified immunity for the complained of conduct.

115.    Defendants, at all times relevant, were policymakers for the CITY and the NYPD and in that capacity established policies, procedures, customs, and/or practices for the City of New York.

116.    These Defendants developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, which were moving forces behind and proximately caused the violations of Mr. Thomas' constitutional and federal rights as set forth herein and in the other claims, resulted from a conscious or deliberate choice to follow a course of action.

117.    Defendants have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

118.    In light of the duties and responsibilities of police officers to serve and protect and uphold the laws of the United States and the State of New York, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein

that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

119.    The deliberately indifferent training and supervision provided by Defendant CITY resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant CITY, the NYPD, and the NYPD License Division and were moving forces in the constitutional and federal violation injuries complained of by Plaintiff.

120.    As a direct result of Defendants' unlawful conduct, Plaintiff has suffered damages and losses as described herein entitling him to compensatory damages, in amounts to be determined at trial.

121.    On information and belief, Plaintiff may suffer lost future earnings and impaired earning capacities in amounts to be ascertained in trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

122.    Finally, Plaintiff seeks appropriate declaratory and injunctive relief pursuant to 42 § 1983 to redress Defendants' above described ongoing deliberate indifference in policies, practices, habits, customs, usages, training and supervision with respect to the rights described herein, and with respect to the ongoing policy and/or practice of the NYPD and the NYPD License Division, which Defendants have no intention to voluntarily correct such policy and/or practice despite an obvious need for such correction.

### FOURTH CLAIM
*MONELL* CLAIM FOR FAILURE TO TRAIN OR PROPERLY SUPERVISE IN VIOLATION OF 42 U.S.C. §1983
(Against Defendant City)

123.    Mr. Thomas hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

124.    42 U.S.C. §1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

125.    Plaintiff in this action is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. §1983.

126.    The Defendants to this claim at all times relevant hereto were acting under the color of state law.

127.    All of the acts and omissions by the individual defendants described above were carried out pursuant to policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agencies, the NYPD and the NYPD License Division.

128.    Defendants CITY, the NYPD, and the NYPD License Division, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

129.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY, the NYPD, and the NYPD License Division, all under the supervisions of ranking officers of the NYPD.

130.    The aforementioned customs, practices, procedures and rules of the CITY, the NYPD, and the NYPD License Division include, but are not limited to considering "incidents" such as dismissed and false arrests in determining whether to grant or revoke handgun licenses while ignoring the dispositions of said arrests, particularly when the arrests did not result in a conviction.

131.    The existence of the aforesaid unconstitutional customs and policies may be inferred from the clearly established corruption and complete disregard of the rights of the citizens of New York City by the NYPD License Division as established by the following:

a.  The testimony of Defendant COOK in Plaintiff's NYPD License Division hearing held to determine the appropriateness of Plaintiff's handgun license revocation. Defendant COOK testified that he considered the number of "incidents" reported to the NYPD License Division and not necessarily the quality or legitimacy of those incidents. Specifically, the testimony reads:

Mr. Tilem: So when you considered incidents, would it be fair to say that you considered the number of incidents whether or not they were openly found to be a violation of Mr. Thomas's license?

Detective Cook: The number – whether the license is continued, suspended, or revoked the incident itself is something that comes into play with whether a license is going to be –

Mr. Tilem: Okay.

Detective Cook: -- revoked or not.

Mr. Tilem: So just so if I can understand what you're saying. I'm not trying to twist your words. I just want to make sure I understand it. It's the number of incidences and not necessarily what the result of your – of the investigation is, correct?

Detective Cook: That is correct.

Hearing Officer Shields: Really? You're not – you're not suggesting that if somebody had eight incidents and they

22

> were cleared of all eight of then, that you would be holding that against them are you?
>
> Detective Cook: I would take it into account of my final decision, yes.

See Exhibit "B", Tran. 34:4-35:3.

b.  In 2016, the NYPD License Division came under fire after an in-depth federal investigation into corruption. Many police officers were removed from their prior positions in the License Division and placed on administrative leave or retired. (See Larry Celona, *Head of scandal-plagued NYPD division quietly retires,* https://nypost.com/2017/04/30/head-of-scandal-plagued-nypd-division-quietly-retires (last visited February 21, 2018).) Indeed, United States Attorney Joon Kim described the corruption in the NYPD License Division and specifically the improper behavior of the officers who "allegedly sold their oath to serve and protect, they sold their duty to do their jobs, they just issued gun licenses to whoever the bribing expediters brought them without conducting the necessary background checks, without questioning their need for a gun license and without following up on major red flag." (See CBS, *Former Police Officers, Ex-Brooklyn Assistant DA Arrested In NYPD Gun License Bribery Scandal*, http://newyork.cbslocal.com/2017/04/25/nypd-gun-license-bribery-scheme-case (last visited February 18, 2018).)

c.  See United States v. John Chambers, 17-MAG-3036, where the United States alleged that Mr. Chambers, willfully and knowingly engaged in corruption where he offered and paid bribes to members of the NYPD License Division for the benefit of individuals who had paid him for assistance of receiving favorable results in relation to the gun license related matters. Specifically, Mr. Chambers was accused of providing tickets to sporting events, an $8,000 watch, sports memorabilia and cash to at least one NYPD Sergeant. The Government alleged that the NYPD sped up the time of the investigation in the Incident Unit from 8-18 months to 3-4 months, resolve the Incident Units' investigation favorably, or ensure that suspension periods were considerably shorter for those who paid bribes.

d.  See United States v. Paul Dean, et. al, 17-MAG-3037, where the United States alleged that the defendants conspired to corruptly to solicit and accept bribes in exchange for assistance of the NYPD License Division in approving, expediting the issuance of and upgrading gun licenses, among other matters before the License Division. There, police officers accepted food, alcohol, parties, dancers and prostitutes from gun license "expediters" in exchange for favorable results and outcomes for the "expediters'" clients.

23

132.    The existence of the above-described unlawful *defacto* policies and/or well-settled and widespread customs and practices is known to, encouraged and or condoned by supervisory and policy making officers and officials of the NYPD, the NYPD License Division, and the CITY, including without limitation, Defendant O'NEIL and Defendant DAVID.

133.    All of the foregoing acts by the individual defendants deprived Plaintiff of federally protected rights, including but not limited to, the constitutional rights enumerated in the allegations of the prior paragraphs incorporated herein.

134.    The CITY knew or should have known that the acts alleged herein would deprive Plaintiff of his rights, in violation of the Second and Fourteenth Amendments to the United States Constitution.

135.    The CITY is directly liable and responsible for the acts of the individual defendants because it repeatedly and knowingly failed to properly supervise, train, instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY, the NYPD, and the NYPD License Division, and to require compliance with the laws of the United States Constitution.

136.    Despite knowledge of such unlawful *defacto* policies, practices, and/or customs, these supervisory and policy making officers and officials of the NYPD, the NYPD License Division, and the CITY, including Defendant O'NEIL and Defendant DAVID, have not taken steps to terminate these policies, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or customs through their active encouragement

of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

137.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the discriminatory procedures and policies detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual Defendants felt empowered to continue to deny and revoke handgun licenses based on a discriminatory policy that creates disparate treatment based on race.

138.    Mr. Thomas' injuries were a direct and proximate result of the CITY, the NYPD, and the NYPD License Division's wrongful *defacto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of Defendants CITY, the NYPD, and the NYPD License Division to properly supervise, train, and discipline their police officers.

**FIFTH CLAIM**
**<u>VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964</u>**
**(Against CITY, NYPD, and NYPD License Division)**

139.    Mr. Thomas hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

140.    42 U.S.C. §2000d provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

141.    Plaintiff in this action is an African-American citizen of the United States.

142.    At all relevant times, Defendants received federal financial assistance. Programs and activities that receive Federal financial assistance from the United States Department of Education (ED) are covered by Title VI.

143.    All of the acts and omission by the individual Defendants described above were carried out pursuant to policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD and the NYPD License Division.

144.    Defendants CITY, the NYPD, and the NYPD License Division, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

145.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY, the NYPD, and the NYPD License Division, all under the supervisions of ranking officers of the NYPD.

146.    The aforementioned customs, practices, procedures and rules of the CITY, the NYPD, and the NYPD License Division include, but are not limited to considering "incidents" such as dismissed and false arrests in determining whether to grant or revoke handgun licenses while ignoring the dispositions of said arrests, particularly when the arrests did not result in a conviction.

147.    The existence of the aforesaid unconstitutional customs and policies may be inferred from the clearly established corruption and complete disregard of the rights of the citizens of New York City by the NYPD License Division as established by the following:

a.  The testimony of Defendant COOK in Plaintiff's NYPD License Division hearing held to determine the appropriateness of Plaintiff's handgun license revocation. Defendant COOK testified that he considered the number of "incidents" reported to the NYPD License Division and not necessarily the quality or legitimacy of those incidents. Specifically, the testimony reads:

> Mr. Tilem: So when you considered incidents, would it be fair to say that you considered the number of incidents whether or not they were openly found to be a violation of Mr. Thomas's license?
>
> Detective Cook: The number – whether the license is continued, suspended, or revoked the incident itself is something that comes into play with whether a license is going to be –
>
> Mr. Tilem: Okay.
>
> Detective Cook: -- revoked or not.
>
> Mr. Tilem: So just so if I can understand what you're saying. I'm not trying to twist your words. I just want to make sure I understand it. It's the number of incidences and not necessarily what the result of your – of the investigation is, correct?
>
> Detective Cook: That is correct.
>
> Hearing Officer Shields: Really? You're not – you're not suggesting that if somebody had eight incidents and they were cleared of all eight of then, that you would be holding that against them are you?
>
> Detective Cook: I would take it into account of my final decision, yes.

See Exhibit "B", Tran. 34:4-35:3.

b.  In 2016, the NYPD License Division came under fire after an in-depth federal investigation into corruption.  Many police officers were removed from their prior

27

positions in the License Division and placed on administrative leave or retired. (See Larry Celona, *Head of scandal-plagued NYPD division quietly retires,* https://nypost.com/2017/04/30/head-of-scandal-plagued-nypd-division-quietly-retires (last visited February 21, 2018).) Indeed, United States Attorney Joon Kim described the corruption in the NYPD License Division and specifically the improper behavior of the officers who "allegedly sold their oath to serve and protect, they sold their duty to do their jobs, they just issued gun licenses to whoever the bribing expediters brought them without conducting the necessary background checks, without questioning their need for a gun license and without following up on major red flag." (See CBS, *Former Police Officers, Ex-Brooklyn Assistant DA Arrested In NYPD Gun License Bribery Scandal*, http://newyork.cbslocal.com/2017/04/25/nypd-gun-license-bribery-scheme-case (last visited February 18, 2018).)

c.  See United States v. John Chambers, 17-MAG-3036, where the United States alleged that Mr. Chambers, willfully and knowingly engaged in corruption where he offered and paid bribes to members of the NYPD License Division for the benefit of individuals who had paid him for assistance of receiving favorable results in relation to the gun license related matters. Specifically, Mr. Chambers was accused of providing tickets to sporting events, an $8,000 watch, sports memorabilia and cash to at least one NYPD Sergeant. The Government alleged that the NYPD sped up the time of the investigation in the Incident Unit from 8-18 months to 3-4 months, resolve the Incident Units' investigation favorably, or ensure that suspension periods were considerably shorter for those who paid bribes.

d.  See United States v. Paul Dean, et. al, 17-MAG-3037, where the United States alleged that the defendants conspired to corruptly to solicit and accept bribes in exchange for assistance of the NYPD License Division in approving, expediting the issuance of and upgrading gun licenses, among other matters before the License Division. There, police officers accepted food, alcohol, parties, dancers and prostitutes from gun license "expediters" in exchange for favorable results and outcomes for the "expediters'" clients.

148.  The existence of the above-described unlawful *defacto* policies and/or well-settled and widespread customs and practices is known to, encouraged and or condoned by supervisory and policy making officers and officials of the NYPD, the NYPD License Division, and the CITY, including without limitation, Defendant O'NEIL and Defendant DAVID.

149.  By being denied a license based on a discriminatory policy, Plaintiff was treated less favorably than his Caucasian counterparts in violation of 42 U.S.C. §2000d.

28

150.    Defendants intentionally, willfully, and without justification acted to deprive Plaintiff of his rights, privileges and immunities secured by them by the laws of the United States, including his right to be free from racial discrimination in programs or activities receiving federal financial assistance.

151.    Defendants, despite knowledge and adequate opportunity to learn of the misconduct of their agents and employees, adopted, approved and ratified the acts, omission, and misconduct of their agents and employees.

152.    Defendants' acts were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's rights secured by Title VI.

<strong><u>JURY DEMAND</u></strong>

153.    Plaintiff Mr. Thomas demands a jury trial in this action on each and every one of his damage claims.

**WHEREFORE**, Mr. Thomas demands judgment against the Defendants, individually and jointly, and prays for relief as follows:

1.   That he be compensated for violation of his constitutional rights, pain, suffering, and humiliation;

2.   That he be awarded punitive damages against the individual defendants; and

3.   That he be compensated for attorneys' fees and the costs and disbursements of this action; and

4.   For such other further and different relief as the Court may deem just and proper.

Dated: White Plains, New York
       March 28, 2018

                              /s/ Peter H. Tilem, Esq._____
                              PETER H. TILEM, ESQ.
                              HILLARY M. NAPPI, ESQ.
                              TILEM & ASSOCIATES, P.C.
                              Attorneys for Plaintiff
                              188 East Post Road
                              White Plains, New York 10601
                              914-833-9785
                              ptilem@tilemlawfirm.com