

THE CITY OF NEW YORK
POLICE DEPARTMENT
LICENSE DIVISION

---

In The Matter of the Application of

DEVON THOMAS

Hearing Index # 45/16

---

One Police Plaza, Room 110
New York, NY 10038

February 15, 2017

HEARING OFFICER:            MARGARET L. SHIELDS, Esq.

WITNESSES TESTIFYING:       Detective JOSEPH COOK
                            Mr. DEVON THOMAS

ATTORNEY FOR APPLICANT:     PETER TILEM, Esq.

Transcribed from CD-Rom #s 11, 12

---

New York City Police Department - One Police Plaza - New York City - 646-610-5560

PROCEEDINGS                                          2

1    HEARING OFFICER SHIELDS:  Today is

2    Wednesday, February 15th, the year 2017.  This is

3    Hearing Index 45 of the year 2016, *a* ~~The~~ hearing

4    requested by pistol licensee, Devon Thomas on the

5    issue of the revocation of his carry guard and gun

6    custodian handgun licenses.  This hearing is being

7    held at 1 Police Plaza, Room 110.  My name is

8    Margaret Shields, S-H-I-E-L-D-S.  I'm an Attorney at

9    Law employed by the New York City Police Department,

10   assigned to the License Division, and designated as

11   the Hearing Officer and a City Administrative Law

12   Judge.  Present in the hearing room are the licensee,

13   Mr. Thomas, and his attorney, Peter Tilem, Esq.  And

14   present as an observer is Attorney Robert Shepter

15   [phonetic], also of Tilem and Associates.  This

16   hearing is being held pursuant to Title 38 of the

17   Rules of the City of New York.  Let me just note that

18   the entire file is on the record and counsel, would

19   you state your appearance for the record?

20        MR. PETER TILEM:  Yes.  Peter Tilem, T-I-L-

21   E-M.  Tilem & Associates, 188 East Post Road in White

22   Plains on behalf of Mr. Thomas.

23        HEARING OFFICER SHIELDS:  Thank you.  And I

24   don't know why but I'm also [unintelligible] *neglected* [1:28]

25   to say that Detective Joseph Cook is also here.  I'm

PROCEEDINGS                                    3

1      gonna start with Detective Cook.  Would you raise

2      your right hand, please?  Do you swear the testimony

3      you are about to give in this hearing is the truth,

4      the whole truth, and nothing but the truth?

5              DETECTIVE COOK:  I do.

6              HEARING OFFICER SHIELDS:  Would you please

7      state your full name, shield, rank, and command for

8      the record?

9              DETECTIVE COOK:  Detective Joseph Cook,

10     Shield Number 6694, Incident Section License

11     Division.

12             HEARING OFFICER SHIELDS:  Detective Cook, do

13     your duties in the License Division involve

14     investigating incidents?

15             DETECTIVE COOK:  Yes.

16             HEARING OFFICER SHIELDS:  And would you

17     state what the License Division [~~unintelligible~~] *considers an*

18     [2:10] incident.  *An incident*

19             DETECTIVE COOK:  ~~And this~~ is basically every

20     licensee that's issued a license has to follow

21     different rules governing that license, whether it's

22     the --

23             HEARING OFFICER SHIELDS:  What *is an* incident?

24             DETECTIVE COOK:  The incident is losing a

25     firearm, not safeguarding a firearm.  There's

PROCEEDINGS                                    4

1    multiple, refile --

2              HEARING OFFICER SHIELDS:  And would it be

3    accurate to say that it's an allegation of violation

4    of any of the rules?

5              DETECTIVE COOK:  Yes.       governing the

6              HEARING OFFICER SHIELDS:  ~~of any~~ permit?

7              DETECTIVE COOK:  Yes.

8              HEARING OFFICER SHIELDS:  Or in an arrest

9    situation?

10             DETECTIVE COOK:  Yes.

11             HEARING OFFICER SHIELDS:  Okay.  Any other

12   situation that comes to the attention of the License

13   Division?

14             DETECTIVE COOK:  Yes.

15             HEARING OFFICER SHIELDS:  ~~As~~ or to law

16   enforcement?  Was there an incident regarding Mr.

17   Thomas that came to the attention of the License

18   Division?

19             DETECTIVE COOK:  Yes, there was.

20             HEARING OFFICER SHIELDS:  And what was it?

21             DETECTIVE COOK:  The incident date of

22   occurrence was April 21, 2016.  The XO of the 25

23   Precinct contacted the Incident Section.

24             HEARING OFFICER SHIELDS:  Tell me what the

25   incident is and then I'll ask you what the details

PROCEEDINGS                                    5

1    are.

2              DETECTIVE COOK:  Okay.  The incident was the

3    licensee was accused of having his firearm showing in

4    public.

5              HEARING OFFICER SHIELDS:  And you said that

6    was -- that occurred on April 21 or you learned about

7    it on April 21 or both?

8              DETECTIVE COOK:  The date -- yeah.  The date

9    received was April 22nd.  The incident date here is

10   April 21st.

11             HEARING OFFICER SHIELDS:  And who was

12   assigned to investigate?

13             DETECTIVE COOK:  Myself, Detective Cook.

14             HEARING OFFICER SHIELDS:  Okay.  Did you

15   send a suspension notice to Mr. Thomas?

16             DETECTIVE COOK:  Yes, I did.

17             HEARING OFFICER SHIELDS:  And when was that?

18             DETECTIVE COOK:  That was May 2, 2016.

19             HEARING OFFICER SHIELDS:  And what did that

20   notice direct Mr. Thomas to do?

21             DETECTIVE COOK:  It directed Mr. Thomas to

22   surrender all his firearms, forward his license to

23   the License Division Incident Section.

24             HEARING OFFICER SHIELDS:  This man had two

25   licenses, correct?

. PROCEEDINGS                           6 ·

1      DETECTIVE COOK:  Yes, he did.

2      HEARING OFFICER SHIELDS:  Uh-huh.

3      DETECTIVE COOK:  Okay.  Forward a notarized

4  written statement to the License Division explaining

5  the facts and circumstances surrounding your

6  incident.  Telephone and speak with the case

7  investigator, which is myself.  And then on

8  disposition of criminal charges against you, if that

9  was the reason why you were in incident.  Forward

10  your certificate of disposition from the court.

11      HEARING OFFICER SHIELDS:  ~~To notify~~ *In point of fact,* Mr.

12  Thomas ~~that he~~ was not arrested --

13      DETECTIVE COOK:  He was not.

14      HEARING OFFICER SHIELDS:  -- correct?  How

15  many firearms were on Mr. Thomas's licenses?

16      DETECTIVE COOK:  Mr. Thomas had -- Mr.

17  Thomas had two firearms on his license.

18      HEARING OFFICER SHIELDS:  Now is that the

19  carry guard or the gun custodian license?

20      DETECTIVE COOK:  It is the -- give me one

21  second.  I believe there were one, two of them were

22  on his carry guard.  I'm sorry.  Two of them were on

23  his gun custodian and one was on his carry guard.

24      MR. TILEM:  I don't want to interrupt

25  Detective Cook.  I just want the record to reflect --

1  and I'm not suggesting he's doing anything wrong.

2  That he's reading from the record here.  That he's

3  not testifying on his -- from his memory.  He's

4  reading from --

5          HEARING OFFICER SHIELDS:  I'm not asking him

6  to testify from his memory.

7          MR. TILEM:  I mean --

8          HEARING OFFICER SHIELDS:  I know exactly

9  what's on the record.

10         MR. TILEM:  Again, I'm not suggesting he's

11  doing anything wrong.  I just want the record to be

12  complete and obviously the record can't see what's

13  going on.  So I'm just trying to draw a picture for

14  the record about what's going on in the room.

15         HEARING OFFICER SHIELDS:  Noted.  You can

16  continue, Detective.

17         DETECTIVE COOK:  So like I said --

18         HEARING OFFICER SHIELDS:  So he had three

19  fire arms?

20         DETECTIVE COOK:  He had two firearms.

21         HEARING OFFICER SHIELDS:  You said he had

22  two on --

23         DETECTIVE COOK:  The -- what do you call it

24  -- the carry guard I believe had --

25         HEARING OFFICER SHIELDS:  Isn't there a

PROCEEDINGS                                    8

1    printout there?

2                DETECTIVE COOK:  There is.  But --

3                HEARING OFFICER SHIELDS:  Okay.

4                DETECTIVE COOK:  -- I'm trying to see which

5    license he has here.  The gun custodian had two guns

6    on the gun custodian license.  Alright.  And the

7    carry guard again, I don't see here, but I believe it

8    was the one gun on it.

9                HEARING OFFICER SHIELDS:  Okay.  Could this

10   have been the same -- the same gun or?

11               DETECTIVE COOK:  It's, it's two different

12   license numbers.

13               HEARING OFFICER SHIELDS:  Okay.  But could

14   it have been the same firearm or no?

15               DETECTIVE COOK:  I'm not sure.

16               HEARING OFFICER SHIELDS:  Alright.  Well

17   maybe we'll ask Mr. Thomas when the time comes.  Did

18   he voucher those?

19               DETECTIVE COOK:  The one gun that was

20   vouchered was the gun I believe -- one gun was

21   printed and sent to us, and we vouchered it.  It was

22   on the gun custodian license and that one had dual

23   gun custodian with another individual.  That was --

24   that's the only one he vouchered for this.

25               HEARING OFFICER SHIELDS:  Okay.  What

PROCEEDINGS                                    9

1     happened to the other firearm?

2              DETECTIVE COOK:  I'm not sure.  I'm not sure

3     what happened to the other one.

4              MR. TILEM:  Just --

5              HEARING OFFICER SHIELDS:  Please don't

6     interrupt, sir.

7              MR. TILEM:  I'm sorry.  I just wanted to

8     clarify --

9              HEARING OFFICER SHIELDS:  You'll have an

10    opportunity to speak.

11             MR. TILEM:  Okay.

12             HEARING OFFICER SHIELDS:  You didn't satisfy

13    yourself that all firearms are accounted for?

14             DETECTIVE COOK:  Again, there must be

15    something I'm missing here.  Believe -- either the

16    other gun custodian took possession of the other

17    firearm.  So one we vouchered and the other one we

18    gave to the company possibly, but I'm not sure one

19    hundred percent in my notes right here.

20             HEARING OFFICER SHIELDS:  And what -- when

21    was -- when was this firearm vouchered?

22             DETECTIVE COOK:  July 12, 2016.

23             HEARING OFFICER SHIELDS:  Two months after

24    the suspension notice?

25             DETECTIVE COOK:  Yes.

PROCEEDINGS                              10

1    　　　　HEARING OFFICER SHIELDS:  At this point, do

2    you -- do you know why there was a delay?

3    　　　　DETECTIVE COOK:  I can only speculate.  By

4    the time I got in contact with Mr. Thomas, and we set

5    up an appointment for him to come into the License

6    Division to explain the -- why he was suspended.  We

7    made an appointment.  He came in and we vouchered it

8    that day that he came into the office.  Why it took

9    two months, again --

10   　　　　HEARING OFFICER SHIELDS:  Is there a

11   timeframe on the suspension notice?

12   　　　　DETECTIVE COOK:  I don't understand

13   timeframe.

14   　　　　HEARING OFFICER SHIELDS:  When was he asked

15   to voucher this and do all these other things?

16   　　　　DETECTIVE COOK:  He, he was asked to voucher

17   on May 2, 2016.

18   　　　　HEARING OFFICER SHIELDS:  Is there a

19   timeframe in the suspension notice?  When does it

20   tell him to do it?

21   　　　　DETECTIVE COOK:  If I can clarify that Mr.

22   Thomas through a phone conversation explained to me

23   he never received the suspension letter.

24   　　　　HEARING OFFICER SHIELDS:  Where was it sent?

25   　　　　DETECTIVE COOK:  It was sent to 57 John

PROCEEDINGS                                          11

1       Court, Elmont, New York.

2                    HEARING OFFICER SHIELDS:  And where is that?

3                    DETECTIVE COOK:  That's in Nassau County.

4                    HEARING OFFICER SHIELDS:  Is that his

5       address of record?

6                    DETECTIVE COOK:  That's the address of

7       record, yes.

8                    HEARING OFFICER SHIELDS:  Okay.  So what was

9       the timeframe on the suspension notice?

10                   DETECTIVE COOK:  Thirty days to the date of

11      his notice -- the notice?

12                   HEARING OFFICER SHIELDS:  "You were directed

13      to immediately."  Is that the timeframe, immediately?

14                   DETECTIVE COOK:  Yes.

15                   HEARING OFFICER SHIELDS:  Is that thirty

16      days?

17                   DETECTIVE COOK:  No, it's not.

18                   HEARING OFFICER SHIELDS:  Okay.  So am I

19      understanding from your testimony, so that when you

20      didn't hear from Mr. Thomas, you contacted him and

21      learned that he had never received this?

22                   DETECTIVE COOK:  Again, I believe I reached

23      out to him again.  I don't recall.

24                   HEARING OFFICER SHIELDS:  Okay.  Do you have

25      any case notes?

PROCEEDINGS                    12

1      DETECTIVE COOK:  This is what I have.

2      HEARING OFFICER SHIELDS:  Okay.  So what did

3  you learn about the incident?

4      DETECTIVE COOK:  I don't understand the

5  question.

6      HEARING OFFICER SHIELDS:  You said he was --

7  he was accused of displaying his firearm in public.

8  What did you learn about that incident?

9      DETECTIVE COOK:  Okay.  I reached out to

10  Captain Walsh, the XO --

11      HEARING OFFICER SHIELDS:  Who, who was the

12  source of the information in the first place, the

13  accusation?

14      DETECTIVE COOK:  The XO of the 25 Precinct,

15  Captain W̶e̶l̶c̶h̶. *Walsh*

16      HEARING OFFICER SHIELDS:  Okay.

17      DETECTIVE COOK:  I'm not sure.

18      HEARING OFFICER SHIELDS:  Okay.  And what

19  did you learn from Captain W̶e̶l̶c̶h̶? *Walsh*

20      DETECTIVE COOK:  That the licensee was

21  inside the 25 Precinct with his firearm exposed.

22      HEARING OFFICER SHIELDS:  And he had a carry

23  gun -- a carry guard and a gun custodian permit?

24      DETECTIVE COOK:  Yes.

25      HEARING OFFICER SHIELDS:  Issued in

PROCEEDINGS                                    13

1    conjunction with what employment?

2              DETECTIVE COOK:  A & M Professional

3    Security.

4              HEARING OFFICER SHIELDS:  So was Mr. Thomas

5    working at the 25 Precinct?

6              DETECTIVE COOK:  No, he was not.

7              HEARING OFFICER SHIELDS:  What was he doing?

8              DETECTIVE COOK:  Through my investigation I

9    learned that Mr. Thomas was there to see D.I. --

10   Deputy Inspector -- I don't want to mess up his name.

11   Harnish [phonetic].

12             HEARING OFFICER SHIELDS:  You'll get a

13   chance to speak, sir.

14             DETECTIVE COOK:  Deputy Inspector Harnish.

15             HEARING OFFICER SHIELDS:  And he was there

16   on business or what?

17             DETECTIVE COOK:  He was there because Deputy

18   Inspector Harnish was retiring, and he wanted to say

19   goodbye to a friend.

20             HEARING OFFICER SHIELDS:  Alright.  And did

21   you discuss the incident with Mr. Thomas?

22             DETECTIVE COOK:  Yes, I did.

23             HEARING OFFICER SHIELDS:  And what did you

24   learn from Mr. Thomas?

25             DETECTIVE COOK:  Exactly what I just stated.

PROCEEDINGS                                14

1   Mr. Thomas was there to see an old friend and say

2   goodbye to him.

3              HEARING OFFICER SHIELDS:  Did he explain why

4   he brought his firearm?

5              DETECTIVE COOK:  Again, I'd have to read

6   from my statement here, but I don't --

7              HEARING OFFICER SHIELDS:  Go ahead.

8              DETECTIVE COOK:  Okay.  Interviewed licensee

9   and licensee stated he is employed as a gun custodian

10  to carry gun by A & M Professional Security

11  Corporation.  Licensee further states on April 21,

12  2016, he was working at Taino Towers.  Taino Towers

13  is located at East 122 Street and Third Avenue.

14  Licensee decided to go to the 25 Precinct after work

15  to say goodbye to D.I. Harnish.  Licensee further

16  stated D.I. Harnish was a friend of his, and he

17  didn't think anyone -- anything was wrong by going to

18  say goodbye to him at the 25.

19             HEARING OFFICER SHIELDS:  Okay.  What else

20  did you learn in the course of your investigation, if

21  anything?

22             DETECTIVE COOK:  Other things I learned in

23  when I was doing my computer checks you mean?

24  Background checks?

25             HEARING OFFICER SHIELDS:  What did you learn

1    in the course of your investigation?

2              DETECTIVE COOK:  I learned that licensee had

3    -- was involved in other incidents.  Had an order of

4    protection that we were not notified on and a

5    criminal court summons that we were not notified on.

6              HEARING OFFICER SHIELDS:  And what other

7    incidents were on his record?

8              DETECTIVE COOK:  On June 20, 2014 a

9    lieutenant from the 25 Precinct notified us of a

10   rally where licensee's gun was exposed again.

11             HEARING OFFICER SHIELDS:  And where was this

12   rally?

13             DETECTIVE COOK:  Where was the rally?  It

14   was up in the 25 Precinct.  The exact location I'm

15   not sure of.

16             HEARING OFFICER SHIELDS:  So was it at Taino

17   Towers; do you know?

18             DETECTIVE COOK:  Again, I'm not sure.

19             HEARING OFFICER SHIELDS:  Okay.  And what

20   happened with that incident?

21             DETECTIVE COOK:  That license was continued

22   without suspension.

23             HEARING OFFICER SHIELDS:  Any other

24   incidents on the record?

25             DETECTIVE COOK:  On May 6, 2011 licensee was

PROCEEDINGS                                    16

1  arrested for criminal mischief.

2              HEARING OFFICER SHIELDS:  And was that made

3  an incident here?

4              DETECTIVE COOK:  That was made an incident

5  and licensee was cancelled.  His license was

6  cancelled.

7              HEARING OFFICER SHIELDS:  Under what

8  circumstances?

9              DETECTIVE COOK:  That -- the computer just

10  says the license was cancelled.  I don't have the

11  information on that.

12              HEARING OFFICER SHIELDS:  What was that in?

13              DETECTIVE COOK:  That was 2011.

14              HEARING OFFICER SHIELDS:  Was that cancelled

15  by the licensee's request or?

16              DETECTIVE COOK:  I'm not sure.

17              HEARING OFFICER SHIELDS:  You don't know?

18              DETECTIVE COOK:  I don't know.

19              HEARING OFFICER SHIELDS:  Okay.

20              DETECTIVE COOK:  Then on May 1, 2011 an

21  order of protection was taken out in Nassau County.

22  It was good for a year.

23              HEARING OFFICER SHIELDS:  ~~[Unintelligible]~~

24  [15:47].  *Orders of protection aren't taken out.*
   *They are issued by a court.*

25              DETECTIVE COOK:  I'm sorry?

1           HEARING OFFICER SHIELDS:  Okay.  What is the

2     protection on -- taken or issued by police?

3           DETECTIVE COOK:  Issued.

4           HEARING OFFICER SHIELDS:  On behalf of who?

5           DETECTIVE COOK:  I believe licensee's wife,

6     but I'm not one hundred percent sure.  And there's no

7     record of us being notified on that.

8           HEARING OFFICER SHIELDS:  Is that order of

9     protection open today?

10          DETECTIVE COOK:  No, it is not.

11          HEARING OFFICER SHIELDS:  No orders of

12    protection currently against Mr. Thomas?

13          DETECTIVE COOK:  There's no orders of

14    protection against him right now.

15          HEARING OFFICER SHIELDS:  Okay.  Any other

16    incidents?

17          DETECTIVE COOK:  In April 10, 2008 licensee

18    was arrested for criminal possession of a weapon.

19    Again, his license was cancelled. *So presumably*

20          HEARING OFFICER SHIELDS:  ~~Is it that~~ he re-

21    applied in both instances?

22          DETECTIVE COOK:  I'm not -- I'm not sure.

23          HEARING OFFICER SHIELDS:  He must have if he

24    had both permits.  Okay.  Anything else, Detective?

25          DETECTIVE COOK:  September 25, 2007,

PROCEEDINGS                                    18

1   licensee failed to notify the license division about

2   a criminal court summons for disorderly conduct.

3                HEARING OFFICER SHIELDS:  Uh-huh.

4                DETECTIVE COOK:  And the last incident is

5   November 19, 1999.  Licensee was arrested on a arrest

6   warrant.  License was cancelled for that one too.

7                HEARING OFFICER SHIELDS:  Okay.

8                DETECTIVE COOK:  That's the last incident.

9                HEARING OFFICER SHIELDS:  Did you learn

10  anything else?  Is that the sum and substance?

11               DETECTIVE COOK:  I'm not sure.  I don't know

12  what --

13               HEARING OFFICER SHIELDS:  Did you learn

14  anything else in the course of your investigation or

15  is that --

16               DETECTIVE COOK:  That's all I have right

17  now.

18               HEARING OFFICER SHIELDS:  Okay.  So when did

19  you close it out?

20               DETECTIVE COOK:  This was closed on August

21  15, 2016.

22               HEARING OFFICER SHIELDS:  And what was --

23  what was ~~the~~ *your* recommendation?

24               DETECTIVE COOK:  *Revoke.* Revocation.

25               HEARING OFFICER SHIELDS:  And what was the

PROCEEDINGS                           19

1    reason for your recommendation?

2            DETECTIVE COOK:  Failure to notify on two

3    individual occurrences, multiple incidents, just *the*

4    licensee's past, past record with incidents and --

5            HEARING OFFICER SHIELDS:  Okay.  And did .

6    your superiors ~~confer~~ *concur* *your recommendation* ~~with you on the investigation~~?

7            DETECTIVE COOK:  Yes, they did.

8            HEARING OFFICER SHIELDS:  Okay.  Let me note

9    for the record that a notice of ~~termination~~ *determination* was

10   issued on September 1, 2016 by the commanding

11   officer, which says; "This is to advise you your carry

12   guard handgun license and gun custodian handgun

13   license have been revoked after *a* review of the facts

14   of circumstances surrounding your ~~resident~~ *incident*.  The

15   determination to revoke is due to ~~absent~~ *the facts and*

16   circumstances surrounding your incident on April 21,

17   2016.  [It is written by a computer] for failure to

18   follow rules of the License Division Title 38.

19   Failure to notify the License Division that you ~~are a~~ *were the*

20   recipient of *a* ~~the~~ criminal court summons and that an ,

21   order of protection was issued against you.  ~~This~~ *Your history*

22   *of arrests and* ~~[unintelligible]~~ [19:41] incidents, and it repeats "

23   "failure to abide by the rules and regulations "

24   governing your firearm's licenses and advises Mr.

25   Thomas that he may request a hearing to challenge

PROCEEDINGS                              · 20

1   this determination, and counsel on his behalf did so.

2   So counsel, before I take Mr. Thomas's testimony, do

3   you have any questions that you want to ask?

4                MR. TILEM:  Yes.  I do have --

5                HEARING OFFICER SHIELDS:  Go ahead.

6                MR. TILEM:  Thank you.  Thank you, Detective

7   Cook.  My name is Peter Tilem.  We met --

8                DETECTIVE COOK:  We did.

9                MR. TILEM:  -- a couple months ago, correct?

10               DETECTIVE COOK:  Yes, we did.

11               MR. TILEM:  Okay.  And that was when Mr.

12  Thomas came in to talk to you about the incident?

13               DETECTIVE COOK:  Yes.

14               MR. TILEM:  And you indicated that there was

15  some delay from the time that the incident happened

16  and you notified him to the time you came in, did you

17  find him cooperative once you learned about the

18  incident?

19               DETECTIVE COOK:  Yes, he was.

20               MR. TILEM:  And did he come in immediately

21  after learning about the incident?

22               DETECTIVE COOK:  Yes, he did.

23               MR. TILEM:  Okay.  And did he answer your

24  questions to your satisfaction?

25               DETECTIVE COOK:  Yes, he did.

PROCEEDINGS                    21

1          MR. TILEM:  Can you tell us anything about

2      his demeanor with regard to coming in and speaking to

3      you?

4          DETECTIVE COOK:  Like I say, he was

5      cooperative in coming in.

6          MR. TILEM:  Okay.  And I was present at that

7      time that he came in, correct?

8          DETECTIVE COOK:  Yes, you were.

9          MR. TILEM:  Okay.

10          JUDGE:  How would you agree?

11          MR. TILEM:  Yes, yes.  But I'm not

12      testifying.  So I wanted to just get it on the

13      record.  So I just want to talk about a couple of

14      these incidents.  Well let's talk about the incident

15      that we're here for.  Are you aware -- you indicated

16      that the allegation was that Mr. Thomas's firearm was

17      visible, correct?

18          DETECTIVE COOK:  Yes.

19          MR. TILEM:  Okay.  Are you aware of whether

20      it was holstered or whether he displayed it in some

21      way?

22          DETECTIVE COOK:  No, I am not.

23          MR. TILEM:  Okay.  So as far as you're

24      aware, it's possible that the gun may have been in

25      its holster, correct?

PROCEEDINGS                          22

1          DETECTIVE COOK:  Again, I can't come to that

2   conclusion.

3          MR. TILEM:  Okay.  Did you ask the XO

4   whether or not he removed it from its holster, and

5   I'm speaking specifically about Captain Walsh or

6   whether it was just -- whether it was just present on

7   his belt?

8          DETECTIVE COOK:  Captain Walsh indicated

9   that the gun was visible by other people.  She was

10  notified of that, and then she notified us.

11         MR. TILEM:  Okay.

12         DETECTIVE COOK:  I don't know the -- where

13  it was, what it was in, how it was being held, but it

14  was visible to the public inside the 25 Precinct.

15         MR. TILEM:  Okay.  Do you know whether Mr.

16  Thomas works in uniform or works in plain clothes?

17         DETECTIVE COOK:  I do not, no.

18         MR. TILEM:  Okay.  Do you know when he works

19  in uniform, whether or not he wears a gun belt and

20  has his gun at his side or whether it's under his

21  shirt?

22         DETECTIVE COOK:  No, I do not.

23         MR. TILEM:  Okay.  Would it be a violation

24  of his license to wear a gun belt and have the gun

25  visible?

PROCEEDINGS                          23

1              DETECTIVE COOK:  The -- it would be a

2      violation as a carry guard being outside the scope of

3      your employment --

4              MR. TILEM:  Okay.

5              DETECTIVE COOK:  -- with a gun.

6              HEARING OFFICER SHIELDS:  That's not what

7      you were asked.

8              MR. TILEM:  Right.  That was not what you

9      were asked.

10             HEARING OFFICER SHIELDS:  Listen to the

11     question.

12             MR. TILEM:  Yes.  Do you understand my

13     question?

14             HEARING OFFICER SHIELDS:  Repeat the

15     question.

16             DETECTIVE COOK:  No, I did not understand

17     the question.

18             MR. TILEM:  Okay.  My question is if it

19     would be a violation of his license and the rules and

20     regulations of the City of New York to work in

21     uniform with a gun belt and have a firearm inside of

22     the holster visible to the public?

23             DETECTIVE COOK:  Would it if -- again --

24             HEARING OFFICER SHIELDS:  If he's working.

25             MR. TILEM:  If he's working.

1      DETECTIVE COOK:  Yeah.  If he's working at -

2  - where he's supposed to be working, would it be a

3  violation?  No, it would not be.

4      MR. TILEM:  Okay.  And you indicated that --

5      HEARING OFFICER SHIELDS:  Excuse me.  I want

6  to ask a question.

7      MR. TILEM:  Yeah.

8      HEARING OFFICER SHIELDS:  In ~~the~~ point of

9  fact, with the carry guard permit, it's expected to be

10 exposed, is it not?

11     DETECTIVE COOK:  That's true, yes.

12     HEARING OFFICER SHIELDS:  I mean a carry

13 guard doesn't work with a concealed firearm.

14     DETECTIVE COOK:  That is true.

15     HEARING OFFICER SHIELDS:  Okay.

16     MR. TILEM:  Now you indicated that Mr.

17 Thomas works at Taino Towers, correct?

18     DETECTIVE COOK:  Yes, I did.

19     MR. TILEM:  And you indicated that that's at

20 East 122nd Street -- I'm sorry.  It's --

21     HEARING OFFICER SHIELDS:  I don't think he

22 did indicate where it was.

23     MR. TILEM:  I'm sorry.

24     MR. THOMAS:  122nd and 3rd Avenue.

25     MR. TILEM:  122nd and 3rd Avenue; is that

1          correct?

2                    DETECTIVE COOK:  Yes.

3                    MR. TILEM:  Okay.  And is that in the -- is

4          it located at 122nd and 3rd Avenue?

5                    DETECTIVE COOK:  Again, this is what was

6          told to me.  It's located at East 122 Street and 3rd

7          Avenue.

8                    MR. TILEM:  And who told you that?

9                    DETECTIVE COOK:  The exact location -- the
                                              *employment was*
10         licensee told me where his [unintelligible] [24:12]

11         was.

12                   MR. TILEM:  Okay.  Did you do anything to

13         verify that?

14                   DETECTIVE COOK:  His, his -- again --

15                   HEARING OFFICER SHIELDS:  Isn't there an

16         address on his permit?

17                   DETECTIVE COOK:  Yeah.  On the gun --

18                   HEARING OFFICER SHIELDS:  What does it say?

19                   DETECTIVE COOK:  I don't have it in front of

20         me so.  Oh, here it is.

21                   HEARING OFFICER SHIELDS:  Sure it is.

22                   DETECTIVE COOK:  So the gun licenses are for

23         a different address.  They're not for that -- those

24         towers.

25                   HEARING OFFICER SHIELDS:  What are they --

PROCEEDINGS                                    26

1          DETECTIVE COOK:  237 West 35th Street, New

2    York, New York.  I'm gathering that's where the

3    office is.  I'm just guessing.

4          MR. TILEM:  Okay.  Well isn't that address

5    that you just gave the offices of A & M Professional

6    Security Corporation?

7          DETECTIVE COOK:  That's where I believe they

8    are, yes.

9          MR. TILEM:  Okay.  And do you know the

10   specific work site of Mr. Thomas other than what he

11   told you?

12         DETECTIVE COOK:  No, I do not.

13         MR. TILEM:  Okay.  Did you conduct any

14   investigation about that?

15         DETECTIVE COOK:  No, I did not.

16         MR. TILEM:  Okay.  Now you indicated that

17   officer -- withdrawn.  You indicated that Captain

18   Walsh gave this information, but I think you just

19   indicated that it was something that she heard from

20   other people; is that correct?

21         DETECTIVE COOK:  That is correct, yes.

22         MR. TILEM:  Okay.  She did not herself see

23   Mr. Thomas with his firearm displayed; is that

24   correct?

25         HEARING OFFICER SHIELDS:  Do you know that?

1          DETECTIVE COOK:  I don't know one hundred

2    percent, but during the conversation I had with

3    Captain Walsh, she said that her officers notified

4.   her about the situation.

5          MR. TILEM:  Okay.

6          DETECTIVE COOK:  Whether she witnessed it

7    herself or not, I am not sure.

8          MR. TILEM:  Okay.  And you didn't ask her

9    whether or not she witnessed it herself, correct?

10         DETECTIVE COOK:  I don't recall.

11         MR. TILEM:  Do you know how long Mr. Thomas

12   has worked at Taino Towers?

13         DETECTIVE COOK:  No, I do not.

14         MR. TILEM:  Do you know how often he goes to

15   the 25 Precinct in the course of his duties at Taino

16   Towers?

17         DETECTIVE COOK:  I do not.

18         MR. TILEM:  Do you know how far Taino

19   Towers is from the 25 Precinct?

20         DETECTIVE COOK:  I do not.

21         MR. TILEM:  Okay.  Would you agree that a

22   carry guard licensee who has business in the 25

23   Precinct would be authorized to carry his firearm

24   into the 25 Precinct if he was doing so as part of

25   his employment?

PROCEEDINGS                               28

1          DETECTIVE COOK:  As -- if it's stated in his

2    employment that he's allowed to go into the 25

3    Precinct then, you know, I'm not sure.

4          MR. TILEM:  What does that mean?  Stating

5    what employment?

6          HEARING OFFICER SHIELDS:  What do you mean

7    ~~stating~~ *stated in* employment?

8          DETECTIVE COOK:  I'm saying if, if that was

9    the realm of what the licensee, if he was doing

10   transactions in the 25 Precinct, why he was a carry,

11   you know, with the carry guard license.

12         MR. TILEM:  In other words, if he assists in

13   an arrest with regard to someone in Taino Towers, he

14   could go in the course of his employment to the 25

15   Precinct to assist in the preparation of whatever

16   report needed to be made?

17         DETECTIVE COOK:  Again, I can't answer that

18   one hundred percent.

19         MR. TILEM:  Okay.  Why not?

20         DETECTIVE COOK:  Because I would have to see

21   the scope of why he was there.  You're saying if he

22   made the arrest himself and he was a witness that I

23   possibly that would fall --

24         HEARING OFFICER SHIELDS:  No.  The -- would

25   the ~~person~~ *precinct* ask him to come to ~~a company them?~~ *accompany them?*

PROCEEDINGS                    29

1          DETECTIVE COOK:  If he was the sole person

2     making the arrest they would -- they would ask him

3     come make an arrest.

4          HEARING OFFICER SHIELDS:  If he was --

5          DETECTIVE COOK:  If, if he was a witness to

6     the crime.

7          HEARING OFFICER SHIELDS:  You mean if he

8     were making an arrest and bringing the suspect into

9     the precinct himself?

10          DETECTIVE COOK:  I believe -- I believe they

11     would ask -- he would come into the precinct with the

12     officers too.

13          MR. TILEM:  And would it ever come up and

14     maybe you asked this during your interviews.  Did it

15     ever come up that he was asked to come into the 25

16     Precinct to meet with officers about conditions

17     within Taino Towers?

18          DETECTIVE COOK:  Again, I don't recall.

19          MR. TILEM:  Okay.  You don't recall whether

20     you asked it or you don't recall whether --

21          DETECTIVE COOK:  If it came up in the

22     conversation, I don't recall.

23          HEARING OFFICER SHIELDS:  And in point of

24     fact, if he were being asked to -- if he were invited

25     to a meeting with the precinct to discuss community

1  conditions, would he be expected to come in with his

2  firearm?

3                  DETECTIVE COOK:  Yeah.  I don't -- I don't

4  know the answer to that.  I'm not sure.

5                  MR. TILEM:  Do you know if Mr. --

6                  HEARING OFFICER SHIELDS:  Well I do.  And I

7  would expect that you would.  What does his carry

8  guard permit allow him to do?

9                  DETECTIVE COOK:  To work in the scope of his

10  employment.

11                  HEARING OFFICER SHIELDS:  Okay.  And what is

12  the scope of his employment?

13                  DETECTIVE COOK:  Taino Towers.

14                  HEARING OFFICER SHIELDS:  Are you sure of

15  that?

16                  DETECTIVE COOK:  Again, I believe so.

17                  MR. TILEM:  Is Mr. Thomas allowed to have

18  his firearm with him when he is traveling to and from

19  the Taino Towers?

20                  DETECTIVE COOK:  He's allowed to carry a

21  firearm when he leaves his place of employment to

22  travel home to his home.

23                  MR. TILEM:  So in other words, he's allowed

24  to carry that firearm with him on his belt out in the

25  open when he leaves his employment and travels home,

PROCEEDINGS                    31

1      correct?

2              DETECTIVE COOK:  That is correct.

3              MR. TILEM:  And in the morning he's allowed

4      to carry his firearm open and exposed as he's

5      traveling to his place of employment, correct?

6              DETECTIVE COOK:  That is correct.

7              MR. TILEM:  Okay.  Really?

8              HEARING OFFICER SHIELDS:  An open --

9              MR. TILEM:  Is it required that he be in

10     uniform when he's doing that?

11             DETECTIVE COOK:  Again, I don't know.

12             MR. TILEM:  Okay.  You don't know whether

13     Mr. Thomas was in uniform on the date of this

14     incident?

15             DETECTIVE COOK:  I do not know.

16             MR. TILEM:  Okay.  Now --

17             HEARING OFFICER SHIELDS:  You don't know

18     whether Mr. Thomas works in uniform or not do you?

19             DETECTIVE COOK:  No.

20             MR. TILEM:  Do you know whether Taino Towers

21     is within the confines of the 25 Precinct?

22             DETECTIVE COOK:  This is what I assumed it

23     was, but do I know one hundred percent, no, I do not.

24             MR. TILEM:  Did you check that in

25     conjunction with your investigation?

PROCEEDINGS                              32

1      DETECTIVE COOK:  No, I did not.

2      MR. TILEM:  Would that have been important

3  to know?

4      DETECTIVE COOK:  I believe so at the time.

5      MR. TILEM:  Now you indicated that there was

6  an incident involving a lieutenant from the 25

7  Precinct in 2014 notifying you that Mr. Thomas had

8  his firearm visible; is that correct?

9      DETECTIVE COOK:  That is correct.

10     MR. TILEM:  Okay.  And I had trouble getting

11 down information about that.  That incident was in

12 2014?

13     DETECTIVE COOK:  Okay.  That incident was

14 June 14, 2014.

15     MR. TILEM:  Okay.  And as a result of that

16 incident, which was reported at the time, correct?

17     DETECTIVE COOK:  Yes,

18     MR. TILEM:  The License Division made a

19 decision not to suspend him, correct?

20     DETECTIVE COOK:  That is correct.

21     MR. TILEM:  And that incident occurred in

22 the 25 Precinct, correct?

23     HEARING OFFICER SHIELDS:  What happened?

24 Was he suspended at all in that incident or not?

25     DETECTIVE COOK:  Just the records just

PROCEEDINGS                                33

1    indicate that his license was --

2              HEARING OFFICER SHIELDS:  So a suspension

3    notice?

4              DETECTIVE COOK:  -- continued.  This is --

5              HEARING OFFICER SHIELDS:  Sometimes -- so it

6    wasn't initially suspended either.

7              DETECTIVE COOK:  It just said the license

8    was continued.

9              MR. TILEM:  Okay.  And --

10             HEARING OFFICER SHIELDS:  So it could have

11   been suspended first and then continued after

12   investigation, could it not?

13             DETECTIVE COOK:  I mean it could have, but I

14   can't speculate on that.

15             HEARING OFFICER SHIELDS:  But you're not

16   seeing a suspension notice.

17             DETECTIVE COOK:  There is no suspension

18   notice.

19             HEARING OFFICER SHIELDS:  Okay.

20             MR. TILEM: And would it be fair to say that

21   that incident occurred at Taino Towers?

22             DETECTIVE COOK:  I don't know where that

23   incident occurred.

24             MR. TILEM:  Okay.  Was that something, by

25   the way, that you considered in your decision to

PROCEEDINGS                                34

1    recommend Mr. Thomas's revocation?

2          DETECTIVE COOK:  That was one of the factors

3    of how many different incidents there were.

4          MR. TILEM:  So when you considered

5    incidents, would it be fair to say that you

6    considered the number of incidents whether or not

7    they were openly found to be a violation of Mr.

8    Thomas's license?

9          DETECTIVE COOK:  The number -- whether the

10   license is continued, suspended, or revoked, the

11   incident itself is something that comes into play

12   with whether a license is going to be --

13         MR. TILEM:  Okay.

14         DETECTIVE COOK:  -- revoked or not.

15         MR. TILEM:  So just so if I can understand

16   what you're saying.  I'm not trying to twist your

17   words.  I just want to make sure I understand it.

18   It's the number of incidences and not necessarily

19   what the result of your -- of the investigation is,

20   correct?

21         DETECTIVE COOK:  That is correct.

22         HEARING OFFICER SHIELDS:  Really?  You're

23   not -- you're not suggesting that if somebody had

24   eight incidents and they were cleared of all eight of

25   them, that you would be holding that against them are

PROCEEDINGS                                35

1       you?

2                   DETECTIVE COOK:  I would take it into

3       account of my final decision, yes.

4                   HEARING OFFICER SHIELDS:  You just told

5       counsel that you would consider the number rather

6       than the quality.

7                   MR. TILEM:  Right.  And I think he's

8       confirmed it.

9                   HEARING OFFICER SHIELDS:  That was the

10      question.  Is that what --

11                  DETECTIVE COOK:  Again, you're asking me

12      would multiple incidents considered in the factor of

13      my final recommendation, yes.

14                  MR. TILEM:  Okay.  Regardless of the outcome

15      of those incidents, correct?

16                  DETECTIVE COOK:  Regardless of the outcome,

17      yes.

18                  MR. TILEM:  Okay.  Thank you.  Now on August

19      10, 2008 you said there was an incident involving Mr.

20      Thomas being arrested for criminal possession of a

21      weapon, correct?

22                  DETECTIVE COOK:  On what date again,

23      counsel?

24                  MR. TILEM:  August 10, 2008.

25                  DETECTIVE COOK:  That was April 10, 2008.

PROCEEDINGS                                    36

1        MR. TILEM:  My mistake, okay.  April 10,

2   2008.  And he was arrested for criminal possession of

3   a weapon, correct?

4        DETECTIVE COOK:  That is correct.

5        MR. TILEM:  And did Mr. Thomas hold a

6   license during that period of time?

7        DETECTIVE COOK:  No, he did not.

8        MR. TILEM:  Well you indicated that as a

9   result of that incident his license was cancelled.

10       DETECTIVE COOK:  I'm sorry.  I believe he

11  held the license, but then it was cancelled after

12  this.

13       MR. TILEM:  Okay.  So at the time he was

14  arrested for criminal possession of a weapon, he had

15  a license to possess a weapon, correct?

16       DETECTIVE COOK:  Yes, he did.

17       MR. TILEM:  Okay.  And are you aware of what

18  happened in court with that incident?

19       DETECTIVE COOK:  No, I am not.

20       MR. TILEM:  Okay.  Are you aware that the

21  case was dismissed?

22       DETECTIVE COOK:  No, I'm not.

23       MR. TILEM:  Okay.  Are you aware that the

24  police department settled a wrongful arrest suit and

25  paid Mr. Thomas money as a result of that?

PROCEEDINGS                    37

 1              DETECTIVE COOK:  No, I did not.

 2              MR. TILEM:  Did this incident figure into

 3      your decision to recommend revocation of Mr. Thomas's

 4      license?

 5              DETECTIVE COOK:  The incident was one of --

 6      yes.

 7              MR. TILEM:  Okay.  Now by the way, when did

 8      Mr. Thomas apply for the license that was revoked in

 9      this incident?

10              DETECTIVE COOK:  2013.

11              MR. TILEM:  2013.  So when he applied for

12      that -- this particular license in 2013, did he

13      report these prior incidents?

14              DETECTIVE COOK:  I, I don't have that

15      information.

16              MR. TILEM:  Okay.  But we --

17              HEARING OFFICER SHIELDS:  You don't have the

18      application [unintelligible] [35:18].  And Counsel,

19      you're asking about the permit.  Your client has two

20      permits.

21              MR. TILEM:  Right.  I'm asking about --

22              HEARING OFFICER SHIELDS:  Whether he applied

23      for it at the same time?

24              MR. TILEM:  They were applied for at the

25      same time.

PROCEEDINGS                          38

1        HEARING OFFICER SHIELDS:  Okay.

2        MR. TILEM:  We'll talk about the

3    circumstances of that in a minute.

4        DETECTIVE COOK:  So Counsel again, what was

5    the question you're asking me?

6        MR. TILEM:  The question was whether Mr.

7    Thomas had reported these prior incidents when he was

8    granted this license in 2013?

9        DETECTIVE COOK:  On the front cover sheet of

10   the application I have an arrest from 4/10/08

11   dismissed and an arrest from 4/30/2011.

12       HEARING OFFICER SHIELDS:  Alright.  That

13   cover sheet is prepared by whom?

14       DETECTIVE COOK:  By the –

15       HEARING OFFICER SHIELDS:  Investigator.

16       DETECTIVE COOK:  -- investigator application

17   section.

18       HEARING OFFICER SHIELDS:  The question is

19   did Mr. Thomas disclose those?  Take a look at Mr.

20   Thomas's application and, and answer counsel's

21   question.

22       DETECTIVE COOK:  I did.  These are the two

23   things that he explained.

24       HEARING OFFICER SHIELDS:  How do you -- what

25   does it say?  This is what the licensee disclosed or

1    what the investigator learned or both?

2              DETECTIVE COOK:  Again, I'm not familiar

3    with these applications.

4              HEARING OFFICER SHIELDS:  I know you're not,

5    but just take a look and --

6              DETECTIVE COOK:  And you're asking me a

7    question that I'm not familiar with to answer.  If

8    you want to, you can bring in the officer that did

9    this application.  I'm sure she can answer the

10   question better than I can.

11             MR. TILEM:  Okay.  Well --

12             HEARING OFFICER SHIELDS:  Well then when you

13   said that he didn't disclose, you're saying that he

14   didn't disclose the incident section?

15             DETECTIVE COOK:  The question I believe that

16   was asked -- that counsel asked me, did he disclose -

17   -

18             HEARING OFFICER SHIELDS:  No.  Earlier on --

19             DETECTIVE COOK:  -- into the application

20   section.

21             HEARING OFFICER SHIELDS:  Earlier on when

22   you said he failed to disclose.  You're saying that

23   he failed to disclose to the incident section; is

24   that correct?

25             DETECTIVE COOK:  The two things he failed to

PROCEEDINGS                    40

1  disclose to the incident section was the order of

2  protection and --

3          HEARING OFFICER SHIELDS:  You're talking

4  about the incident section --  *and the summons*

5          DETECTIVE COOK:  -- [unintelligible]

6  [37:25].

7          HEARING OFFICER SHIELDS:  -- and not anyone

8  else, right?  And your testimony is that you're not

9  sure whether he disclosed in the application process,

10  correct?

11          DETECTIVE COOK:  Yép.

12          HEARING OFFICER SHIELDS:  Okay.

13          MR. TILEM:  Okay.  So let me just understand

14  this because you indicated that Mr. Thomas applied

15  for the current license in 2013, correct?

16          DETECTIVE COOK:  That's what it says inside

17  of --

18          MR. TILEM:  Okay.

19          DETECTIVE COOK:  -- the application.

20          MR. TILEM:  Okay.  Does that conclude --

21  *or* what do we need to change tapes?

22          HEARING OFFICER SHIELDS:  Not just yet.

23          MR. TILEM:  Okay.  You'll let me know.

24  Thank you.  So my question is, if you considered in -

25  - as part of the decision to revoke Mr. Thomas,

PROCEEDINGS                          41

1    information that was known to the License Division at

2    the time he applied for this license in 2013?

3            DETECTIVE COOK:  One more time, Counsel.

4            MR. TILEM:  Yes.  My question is if you

5    considered, in recommending revocation of Mr. Thomas's

6    license, information that was known to the License

7    Division when he applied --

8            HEARING OFFICER SHIELDS:  I think that he --
     has
9    Captain already indicated that he doesn't know

10   whether it was known or not.

11           MR. TILEM:  Okay.  Is that -- is that

12   correct?  You don't know whether the incidents that

13   formed the basis of your decision to revoke were

14   known to Mr. Thomas -- I'm sorry, were known to the

15   License Division --

16           DETECTIVE COOK:  Through the application

17   process.

18           MR. TILEM:  -- through the application

19   process?

20           DETECTIVE COOK:  I do not know.

21           MR. TILEM:  Okay.  Do you think that that

22   would be a factor that would be important to know?

23           DETECTIVE COOK:  Again, I can't -- I can't

24   answer that.

25           MR. TILEM:  As part of your investigation,

PROCEEDINGS                                    42

1    you didn't review his original application, correct?

2              DETECTIVE COOK:  I did not review his

3    application, no.

4              MR. TILEM:  Were you aware, by the way, that

5    when he applied for the current carry guard license

6    and the current handgun custodian license, that the

7    License Division approved one and disapproved another

8    one?

9              HEARING OFFICER SHIELDS:  Counsel, he's

10   already testified that he didn't review the file.

11             MR. TILEM:  Okay.  Is that correct?

12             DETECTIVE COOK:  That's correct.

13             MR. TILEM:  Okay.  You indicated that there

14   was a failure to notify the License Division about a

15   criminal court summons and a order of protection,

16   correct?

17             DETECTIVE COOK:  That is correct.

18             MR. TILEM:  Okay.  And do you have a copy of

19   the order of protection?                    DCJS

20             DETECTIVE COOK:  I have a copy of the ~~DCJS~~

21   printout _that_ ~~It~~ has Mr. Thomas with a _cleared_ ~~declared~~ order of

22   protection for the person that was applying against

23   him issued and _a cleared_ ~~declared~~ date.  If you would like to

24   see that, I can show you.

25             MR. TILEM:  Well I am not sure what, what

PROCEEDINGS                    43

1     you have there, but what I'm asking you is whether

2     you've seen a copy of the order of protection?

3              DETECTIVE COOK:  The exact order of

4     protection, no, I have not.

5              MR. TILEM:  Do you know whether Mr. Thomas

6     knew about the order of protection or whether it was

7     granted ex parte?

8              DETECTIVE COOK:  No, I ~~did~~ *do* not.

9              MR. TILEM:  Okay.  Do you know what ex parte

10    means?  Without him being present?

11             DETECTIVE COOK:  Yes, I do.

12             MR. TILEM:  Okay.  And so you don't know

13    whether he was aware of it or not?

14             DETECTIVE COOK:  No, I do not.

15             MR. TILEM:  Do you know how long the order

16    of protection was in effect?

17             DETECTIVE COOK:  Yes, I do.

18             MR. TILEM:  Okay.  How long was it in

19    effect?

20             DETECTIVE COOK:  About 14 months, I believe.

21    I can give you the exact *date if you want it*  It was issued May 1, 2011.

22    It expired April 30, 2012.

23             MR. TILEM:  So that's one year.

24             DETECTIVE COOK:  One year.

25             MR. TILEM:  Right.  Do you know whether it

PROCEEDINGS                                    44

1    was terminated early for any reason?

2                  DETECTIVE COOK:  I do not know that.

3                  MR. TILEM:  Okay.  And on an order of

4    protection it tells you how the person was notified

5    of that the existence of the order of protection,

6    whether it was in court.  Many times the order of

7    protection is signed by the individual.  Are you

8    aware of that?

9                  DETECTIVE COOK:  Yeah.  I am aware of that,

10   yes.

11                 MR. TILEM:  Okay.  Do you know if Mr. Thomas

12   was notified or ~~have~~ how?

13                 DETECTIVE COOK:  I have no idea.

14                 MR. TILEM:  Okay.  And you never sought a

15   copy of that order of protection, correct?

16                 DETECTIVE COOK:  The original order of

17   protection, no, I did not.

18                 MR. TILEM:  Do you know what court issued

19   that order of protection?

20                 DETECTIVE COOK:  I believe it was Mineola,

21   Nassau County ordered it.

22                 MR. TILEM:  Do you know which court in

23   Nassau County?

24                 HEARING OFFICER SHIELDS:  What, what ~~is~~ does your

25   --

PROCEEDINGS                                    45

1              DETECTIVE COOK:  It says Nassau County --

2              HEARING OFFICER SHIELDS:  -- ~~notes~~ printout say?

3              DETECTIVE COOK:  -- PD Mineola.  That's all

4    I know.

5              MR. TILEM:  It says Nassau County PD

6    Mineola?

7              DETECTIVE COOK:  Yep.

8              MR. TILEM:  Now obviously the Nassau County

9    Police Department can't issue an order of protection.

10   Does, does it have a court name on it?

11             DETECTIVE COOK:  It doesn't have a court

12   name on it, no.

13             MR. TILEM:  Reviewing that record, can you

14   be sure that a court issued an order of protection?

15             DETECTIVE COOK:  Yes, I can.

16             MR. TILEM:  Okay.  What --

17             HEARING OFFICER SHIELDS:  I'm sorry, ~~That's~~ Counselor,

18   -- I'm gonna stop you and change tapes.

19             MR. TILEM:  Thank you.

20             [OFF THE RECORD]

21             [ON THE RECORD]

22             HEARING OFFICER SHIELDS:  Alright, Counsel.

23   We're back on the record.

24             MR. TILEM:  Thank you.  So my question was -

25             -

PROCEEDINGS                                46

1          HEARING OFFICER SHIELDS:  And the time is

2   about 2:15.

3          MR. TILEM:  Thank you.  My question had to

4   do with the whatever computer check you did.  If you

5   can be sure that an order of protection was issued as

6   against Mr. Thomas based upon whatever check you did?

7          DETECTIVE COOK:  I can be sure Mr. Thomas --

8   there was an order of protection against him.  The

9   order of protection on this printout has his Social

10  Security number attached to Mr. Thomas.  It also has

11  the person being named as -- the last name of female

12  Thomas and but I cannot be sure whether he was

13  present in court or not.

14         MR. TILEM:  Okay.  Now just so I know, how

15  could you be sure that that computer printout is

16  accurate?

17         DETECTIVE COOK:  How could I be sure?

18         MR. TILEM:  Yeah.

19         DETECTIVE COOK:  This is --

20         HEARING OFFICER SHIELDS:  Detective, answer

21  the question.  If you can't, then say so.

22         DETECTIVE COOK:  Again, I assume that it's

23  sure --

24         HEARING OFFICER SHIELDS:  The question is

25  how can you be sure that it's accurate.

PROCEEDINGS                                      47

1          DETECTIVE COOK:  Could I be a hundred

2    percent sure?  No, I cannot be one hundred percent

3    sure.

4          MR. TILEM:  You don't even know even based

5    upon that, what court issued the order of protection;

6    is that correct?

7          DETECTIVE COOK:  That is correct.

8          MR. TILEM:  Now you also indicated that Mr.

9    -- one of the basis for your recommendation of

10   revocation was a criminal court summons that was

11   issued.

12         DETECTIVE COOK:  That is correct.

13         MR. TILEM:  Okay.  You're aware that people

14   who are issued summonses ~~they're~~ their fingerprints are not

15   taken, correct?

16         DETECTIVE COOK:  That is correct.

17         MR. TILEM:  Okay.  Do you have a copy of the

18   summons here?

19         DETECTIVE COOK:  I have a copy of the

20   summons printout here.  The actual summons itself I

21   do not have.

22         MR. TILEM:  Okay.  What court was that

23   summons issued in?

24         DETECTIVE COOK:  That was issued in 25

25   Precinct.  So it would be Manhattan, Court of New

1    York.

2             MR. TILEM:  Do you know what happened with

3    that summons?

4             DETECTIVE COOK:  I do not.

5             MR. TILEM:  Do you know what the summons was

6    for?

7             DETECTIVE COOK:  It says disorderly conduct.

8    Refuse lawful order.

9             MR. TILEM:  Do you know that it was Mr.

10   Thomas -- this Mr. Thomas who was issued that

11   summons?

12            DETECTIVE COOK:  I cannot -- again, I

13   assumed it's Mr. Thomas with the parameters of the

14   summons I'm reading through here.

15            MR. TILEM:  Okay.  And what is the basis of

16   that assumption?

17            DETECTIVE COOK:  Name, date of birth, home

18   address.

19            MR. TILEM:  Do you know whether Mr. Thomas

20   was aware of that criminal court summons?

21            DETECTIVE COOK:  No, I do not.

22            MR. TILEM:  Do you know whether it was

23   dismissed or not?

24            DETECTIVE COOK:  No, I do not.

25            MR. TILEM:  And what date was that issued?

PROCEEDINGS                          49

1              DETECTIVE COOK:  9/25/2007.

2              MR. TILEM:  9/25/2007, okay.  So in other

3    words -- I thought you said there was one in 2014.

4    Did I get that wrong?

5              DETECTIVE COOK:  2014 that was -- 2014 was

6    the other violation of the rules at the rally with

7    the gun exposed.

8              MR. TILEM:  Okay.  So 2007 there was a

9    summons issued for disorderly conduct and the -- when

10   you say that he failed to notify the License

11   Division, you mean he failed to notify the incident

12   section of the License Division, correct?

13             DETECTIVE COOK:  Again, he failed to notify

14   the License Division.  The incident section is part

15   of the License Division, but nobody in the License

16   Division as a whole was notified of this incident.

17             MR. TILEM:  Well --

18             HEARING OFFICER SHIELDS:  How, how do you

19   know this?

20             MR. TILEM:  Yeah.

21             HEARING OFFICER SHIELDS:  You already

22   testified that you [unintelligible] [3:58] section or

23   not.

24             DETECTIVE COOK:  There is no record of Mr.

25   Thomas notifying the incident section.

PROCEEDINGS                          50

1      MR. TILEM:  Okay.  So right.  So my question

2  then is just very simply, when you say that he didn't

3  notify -- that he did not notify anyone about this

4  summons, you're just saying he didn't notify the

5  incident section, correct?

6      DETECTIVE COOK:  There is no record of an

7  incident being made on that summons.

8      MR. TILEM:  Okay.  But you don't know

9  because you haven't looked at his past license

10  application, whether he disclosed any of that on his

11  past license applications, correct?

12      DETECTIVE COOK:  I do not know anything

13  about his past applications.

14      MR. TILEM:  Okay.  And by the way, the order

15  of protection that was originally issued against Mr.

16  Thomas, what year was that?

17      DETECTIVE COOK:  That was --

18      HEARING OFFICER SHIELDS:  Given ~~the~~ the day

19  that it was issued and the day it expired.

20      DETECTIVE COOK:  5/1/2011.

21      MR. TILEM:  5/1 -- so again, these incidents

22  were before this license was issued, correct?

23      DETECTIVE COOK:  Which -- I'll say yeah.

24  These incidents --

25      MR. TILEM:  These incidences were before --

PROCEEDINGS                51

1          DETECTIVE COOK:  Before --

2          MR. TILEM:  Before these licenses --

3          DETECTIVE COOK:  Before the 2013 license was

4     issued, yes.

5          MR. TILEM:  Okay.  And so let me just ask

6     you this.  Are these computer checks that you did as

7     part of your investigation of this incident

8     continually done by the License Division in

9     investigating someone's application for a license?

10          DETECTIVE COOK:  Again, I'm not part of the

11     application -- this side of this division.  So I

12     don't know exactly what they do.

13          MR. TILEM:  Okay.

14          DETECTIVE COOK:  I can't answer that

15     question.

16          MR. TILEM:  Okay.  And you don't know

17     whether the License Division as a whole was aware of

18     these incidents at the time that they granted the

19     2013 application, right?

20          DETECTIVE COOK:  I do not know.

21          MR. TILEM:  Okay.

22          [OFF MIC CONVERSATION]

23          MR. TILEM:  No.  Nothing further.

24          HEARING OFFICER SHIELDS:  Okay.

25     [Unintelligible] [5:57].  Do you have time to stay?

PROCEEDINGS                                      52

1      DETECTIVE COOK:  Yes.

2      HEARING OFFICER SHIELDS:  I'm gonna take Mr.

3   Thomas's testimony.  ~~Can~~ you raise your right hand,

4   sir?

5      MR. THOMAS:  Yes, ma'am.

6      HEARING OFFICER SHIELDS:  Do you swear the

7   testimony you are about to give in this hearing is

8   the truth, the whole truth, and nothing but the

9   truth?

10     MR. THOMAS:  Yes.

11     HEARING OFFICER SHIELDS:  Okay.  Put your

12  hand down and please state your full name and address

13  for the record.

14     MR. THOMAS:  Yes.  My name is Devon Thomas.

15  My home address is [cough] excuse me, I'm sorry.. It's 57

16  Joan Court, Elmont, New York 1100 --

17     HEARING OFFICER SHIELDS:  57 Joan Court.

18     MR. THOMAS:  Joan Court, Elmont.

19     HEARING OFFICER SHIELDS:  Elmont?

20     MR. THOMAS:  Yes, New York.  11003.

21     HEARING OFFICER SHIELDS:  And how long have

22  you lived there, sir?

23     MR. THOMAS:  Twelve years.

24     HEARING OFFICER SHIELDS:  And where are you

25  employed?

PROCEEDINGS                     53

1           MR. THOMAS:  I'm employed in Taino Towers,

2     and I'm security.

3           HEARING OFFICER SHIELDS:  No.  Who's your

4     employer?

5           MR. THOMAS:  A & M Security.

6           HEARING OFFICER SHIELDS:  A & M Security.

7           MR. THOMAS:  Security, yes.

8           HEARING OFFICER SHIELDS:  And your site of

9     work is?

10          MR. THOMAS:  I'm the site manager for the

11    complex, security.  I've worked there for 17 years.

12          HEARING OFFICER SHIELDS:  Taino, T-A --

13          MR. THOMAS:  T-A-I-N-O.  Towers.

14          HEARING OFFICER SHIELDS:  Okay.  And where

15    is that located?

16          MR. THOMAS:  That's located on 2253 3rd

17    Avenue, New York, New York.

18          HEARING OFFICER SHIELDS:  That's just

19    between what and what?

20          MR. THOMAS:  Oh, yes.  Between 2nd and 3rd

21    Avenue.

22          HEARING OFFICER SHIELDS:  And how long have

23    you worked there, sir?

24          MR. THOMAS:  Seventeen years.  I work at

25    Taino Towers and the 25 Precinct.

PROCEEDINGS                                    54

1          HEARING OFFICER SHIELDS:  Sorry, what?

2          MR. THOMAS:  Then I work with the 25

3     Precinct also.

4          HEARING OFFICER SHIELDS:  What do you mean

5     you work with the precinct?

6          MR. THOMAS:  We -- a lot of crimes being

7     committed.  I work with the gang intelligence.  So

8     I'm responsible for at least 30 percent of the

9     arrests on the area --

10         HEARING OFFICER SHIELDS:  Are you telling me

11    you have some official job with the police

12    department?

13         MR. THOMAS:  Yeah.  I've worked with every

14    captain in the ~~specter~~ *Sector* out of the 25 Precinct.

15         HEARING OFFICER SHIELDS:  Explain that.

16         MR. THOMAS:  Yes.  To decrease crime in the

17    neighborhood.  Narcotics, drug sale, gun possessions

18    I've taken off the street.  So I go to the 25

19    Precinct on a daily basis where I work with all

20    shifts.  So I work with narcotics, gang --

21         HEARING OFFICER SHIELDS:  You go to the 25

22    Precinct on a --

23         MR. THOMAS:  Yes.

24         HEARING OFFICER SHIELDS:  -- daily basis

25    doing what?

PROCEEDINGS                  55

1          MR. THOMAS:  Working with them improving the

2     neighborhood, ma'am.  Decreasing crimes.

3          MR. TILEM:  Well tell her what you do.

4          MR. THOMAS:  Oh, okay.  Like, like I'm

5     visible.  So I'm able to see what's going on outside.

6     So I work with them to let them know --

7          HEARING OFFICER SHIELDS:  I know what a good

8     citizen does.  Tell me what you're doing in the

9     precinct.

10         MR. THOMAS:  Oh, no.  What I do in the

11    precinct ma'am, I help them with the information

12    resource that could help drug buys, illegal guns,

13    gangs in the neighborhood.  They're not able to see.

14    I'm out in the open so I'm able to see everything.

15    So I take them to locations at my job where they can

16    see crimes being committed.  And also I go there to

17    look at the lineups for gang members.  Anyone that

18    committed crime, they need certain information.

19         HEARING OFFICER SHIELDS:  I assume that when

20    you're going to look at a lineup, you're invited to a

21    lineup?  You don't --

22         MR. THOMAS:  I'm not --

23         HEARING OFFICER SHIELDS:  -- attend lineups

24    do you?

25         MR. THOMAS:  No, no.  Just if a crime is

PROCEEDINGS                         56

1    being committed around the area and they need some

2    information, description.  I know everyone there.  So

3    I pretty much am accurate in what I'm doing there.

4              HEARING OFFICER SHIELDS:  Okay.  So Taino   *more than one building?*

5    Towers encompasses what?  Is it [~~unintelligible~~]
     *An enclave?*
6    [9:42]?

7              MR. THOMAS:  Taino Towers, no.

8              HEARING OFFICER SHIELDS:  [Unintelligible]

9    [9:44].

10             MR. THOMAS:  No.  We have at least four or

11   five residents that live there.

12             HEARING OFFICER SHIELDS:  How many

13   buildings?

14             MR. THOMAS:  There's four buildings.

15             HEARING OFFICER SHIELDS:  Okay.  And then

16   where are they located?

17             MR. THOMAS:  They are located at 123rd --

18   122 --

19             HEARING OFFICER SHIELDS:  And what's the --

20   what's the area from what to what?

21             MR. THOMAS:  I'd say from 123 and 122 to 3rd

22   and 2nd.

23             HEARING OFFICER SHIELDS:  To 2nd and 3rd.

24             MR. THOMAS:  Yes.  123 and 122.

25             HEARING OFFICER SHIELDS:  And what cross

PROCEEDINGS                    57

1    streets?

2              MR. THOMAS:  The cross streets are 123rd and

3    122nd.  Between 3rd and 2nd.

4              HEARING OFFICER SHIELDS:  So how long had

5    you had all of your permits?

6              MR. THOMAS:  I've had my permits, ma'am,

7    since 2002.  Since -- I had my permits from '90, I'm

8    sorry, '95, '96.

9              HEARING OFFICER SHIELDS:  Can you explain

10   why your permits were cancelled three times?

11             MR. THOMAS:  What happened was I was falsely

12   arrested.  I notified the police department.  I went

13   to court.  My case was dismissed because --

14             HEARING OFFICER SHIELDS:  How were your

15   permits cancelled?  ~~Where~~ It's a very unusual

16   occurrence here.

17             MR. THOMAS:  I don't -- you mean --

18             HEARING OFFICER SHIELDS:  The permit would

19   be cancelled.  Did you request to have them

20   cancelled?

21             MR. THOMAS:  I never requested a permit be

22   cancelled.

23             HEARING OFFICER SHIELDS:  And your permits

24   were just cancelled after an incident?

25             MR. THOMAS:  It was just cancelled after

PROCEEDINGS                    58

1    incident, yeah.

2              HEARING OFFICER SHIELDS:  And then you

3    reapplied or what?

4              MR. THOMAS:  No, no.  What happened was,

5    ma'am, I was working for Alco Management Security

6    Company.

7              MR. TILEM:  The question is after your

8    license was cancelled --

9              MR. THOMAS:  Yes.

10             MR. TILEM:  -- did you reapply?

11             MR. THOMAS:  No, no.  My license was never

12   cancelled, ma'am.  I reapplied 'cause the company --

13             HEARING OFFICER SHIELDS:  Our records here

14   show that you were -- that after three incidents,

15   your permits were cancelled.  Then you reapplied in

16   2013 for your current --

17             MR. THOMAS:  No.

18             MR. TILEM:  Listen very -- listen very

19   carefully to her questions, okay.

20             MR. THOMAS:  Yes.

21             MR. TILEM:  Because before you said that

22   your license --

23             HEARING OFFICER SHIELDS:  Counsel, I'll

24   handle it.

25             MR. THOMAS:  Yeah.  Go ahead.

PROCEEDINGS                                   59

1        HEARING OFFICER SHIELDS:  You can do it on

2   cross.

3        MR. THOMAS:  Yes, go ahead, ma'am.

4        HEARING OFFICER SHIELDS:  You just said that

5   you never reapplied, but our records that you -- the

6   permits that you hold right now --

7        MR. THOMAS:  Yes.

8        HEARING OFFICER SHIELDS:  -- you applied for

9   in 2013.

10        MR. THOMAS:  That's correct, ma'am.

11        HEARING OFFICER SHIELDS:  And between 2013 -

12   -

13        MR. THOMAS:  Yes.

14        HEARING OFFICER SHIELDS:  -- and 2002 --

15        MR. THOMAS:  Yes.

16        HEARING OFFICER SHIELDS:  -- our records

17   show your permits were cancelled three times.

18        MR. THOMAS:  Yes.

19        HEARING OFFICER SHIELDS:  I'm asking you if

20   you can explain that.

21        MR. THOMAS:  No, ma'am.    *Detective Cook can't.*

22        HEARING OFFICER SHIELDS:  [Unintelligible]

23   [12;26].

24        MR. THOMAS:  Well --

25        HEARING OFFICER SHIELDS:  Nor can I.  I'm

PROCEEDINGS                          60

1    looking for some illumination from you if you have

2    it.

3            MR. THOMAS:  Actually I don't, ma'am.  You

4    know, I applied for my license and they told me I was

5    arrested.  I said my case was dismissed.  I gave them

6    every deposition.  I told them I was falsely arrested

7    and when they investigated and see that it was

8    correct, they sent me a letter to come and get my

9    license.

10           HEARING OFFICER SHIELDS:  So it was

11   cancelled and they just automatically reinstated?

12   You didn't reapply?

13           MR. THOMAS:  No.  They told me to come and

14   get my license [unintelligible] [13:07].

15           HEARING OFFICER SHIELDS:  So the only time

16   you reapplied was in 2013?

17           MR. THOMAS:  That's, that's correct, ma'am.

18   That's correct.

19           HEARING OFFICER SHIELDS:  So do you work in

20   uniform or in plain clothes?

21           MR. THOMAS:  I'm always in uniform there.

22   Ninety-nine percent of the time I'm in uniform.

23           HEARING OFFICER SHIELDS:  And what is your

24   understanding that your permit allows you to do? with a

25   Carry guard permit.

PROCEEDINGS                           61

1              MR. THOMAS:  Yes.  My understanding is,

2     Judge, to engage in employment from my premises to my

3     job.

4              HEARING OFFICER SHIELDS:  Okay.  Your

5     residence.

6              MR. THOMAS:  And to my residence.  And the

7     only time I carry my firearm is if I'm engaged in

8     employment.

9              HEARING OFFICER SHIELDS:  Okay.  And you

10    can't go shopping?

11             MR. THOMAS:  Oh, no.  Yes.

12             HEARING OFFICER SHIELDS:  Elsewhere.

13             MR. THOMAS:  Yes.

14             HEARING OFFICER SHIELDS:  So why were you

15    carrying it to a -- what sounds like a retirement

16    party?

17             MR. THOMAS:  On the day -- the day of the

18    incident you're talking about, I go to the 25 -- I go

19    to every meeting.  Community Board at the 25

20    Precinct.  That day we got a -- the property manager

21    got an invite to go to the 25 Precinct.

22             HEARING OFFICER SHIELDS:  If you go to a

23    community council meeting, why would you be carrying

24    a firearm to that?

25             MR. THOMAS:  Hold on.  Ma'am, I went down

PROCEEDINGS                        62

1    there to speak to one of the guys from gang

2    intelligence about activity.  I'm like public enemy

3    number one.  So I'm walking most of the time, and I'm

4    by myself.  The only reason I had my firearm was for

5    my safety.

6                HEARING OFFICER SHIELDS:  But you don't have

7    a carry permit?

8                MR. THOMAS:  I have --

9                HEARING OFFICER SHIELDS:  You have a carry

10   guard permit.

11               MR. THOMAS:  Yeah.  I have a carry guard --

12               HEARING OFFICER SHIELDS:  It's not the same

13   thing.

14               MR. THOMAS:  -- yes.  I have a carry guard

15   permit.  Ma'am, I have -- my license you can see.

16   I've been having that firearm going to the precinct

17   with no problem.  No incident for 17 years.

18               HEARING OFFICER SHIELDS:  Okay.  So the

19   order of protection that came up in Detective Cook's

20   investigation, were you aware of that order?

21               MR. THOMAS:  No, ma'am.  I never had any

22   order of protection against me.

23               HEARING OFFICER SHIELDS:  What's the basis

24   of your stating that?

25               MR. THOMAS:  What happened is that an

PROCEEDINGS                        63

1     incident where my stepdaughter called the cops.  The
2     cops came to my house.  My wife told the officers
3     that she's upset because I just had -- at the time I
4     just had twins.  And with my job responsibility, I
5     couldn't really take my wife out.  So she was a
6     little upset.  So she had her daughter call the
7     officers.  When the officers came over, my wife threw
8     a drawer on the floor -- a drawer or whatever on the
9     floor, and it came that I was leaving.  They said I
10    could leave, and they took me in, and I was arrested.
11    And I asked them -- I said after checking to make
12    sure everything went to court and it was dismissed,
13    ma'am.  With nothing -- I am sick.  That's why I
14    sound like this.  I've been sick the last three days.
15          HEARING OFFICER SHIELDS:  Well the records
16    show that an order of protection was issued against
17    you.
18          MR. THOMAS:  I have never -- I lived in the
19    same house with my wife, ma'am, for 12 years.  I have
20    never received any order of protection.
21          HEARING OFFICER SHIELDS:  Well that's
22    different than having one issued against you.
23          MR. THOMAS:  Huh?  No.  I haven't received
24    any.  No one gave me any order of protection, ma'am.
25    When I went to court, there was no order of

PROCEEDINGS                                    64

1    protection.  My wife was there.

2              HEARING OFFICER SHIELDS:  Counsel?

3              MR. TILEM:  You indicated you've been

4    working at Taino Towers for 17 years?

5              MR. THOMAS:  Seventeen years.

6              MR. TILEM:  Okay.  And how frequently during

7    those 17 years did you go to the 25 Precinct on

8    business?

9              MR. THOMAS:  Three or four times.

10             MR. TILEM:  Three to four times during the

11   17 years or three to four times a day, a week?

12             MR. THOMAS:  During the week.

13             MR. TILEM:  Three to four times per week?

14             MR. THOMAS:  Yes.

15             MR. TILEM:  Okay.  When you go to the 25

16   Precinct those three to four times a week, do you go

17   in uniform or in plain clothes?

18             MR. THOMAS:  In uniform all the time.

19             MR. TILEM:  How far is it between the --

20             HEARING OFFICER SHIELDS:  Is that the

21   uniform you're wearing?

22             MR. THOMAS:  Yes, ma'am.

23             HEARING OFFICER SHIELDS:  I don't have a

24   camera here, but stand up so I can see it.

25             MR. THOMAS:  My jacket is off.

PROCEEDINGS                                     65

1            MR. TILEM:  So this is not your complete

2      uniform?

3            MR. THOMAS:  This is my complete uniform,

4      sir.

5            MR. TILEM:  Okay.

6            HEARING OFFICER SHIELDS:  Where is your

7      firearm?

8            MR. THOMAS:  I don't have any firearm on me.

9            HEARING OFFICER SHIELDS:  Well if you had it

10     on, where would it be?

11           MR. THOMAS:  It would be on my hip in the

12     holster.

13           HEARING OFFICER SHIELDS:  So it would be

14     visible --

15           MR. THOMAS:  It would be --

16           HEARING OFFICER SHIELDS:  -- when I'm

17     looking at you?

18           MR. THOMAS:  Oh, no.  It would be visible if

19     you were looking at me, yes.

20           MR. TILEM:  Okay.  Do you wear a badge or

21     any kind of patch or anything?

22           MR. THOMAS:  Kind of like a security badge.

23     I have a badge that says security ~~director~~ on it.

24           MR. TILEM:  Okay.  And you wear that as part

25     of your uniform?

PROCEEDINGS                                    66

1          MR. THOMAS:  Yes.

2          MR. TILEM:  Okay.  And do you have any patch

3     --

4          HEARING OFFICER SHIELDS:  Why do you say

5     uniform?  You're just wearing a navy jacket.  I don't

6     see --

7          MR. THOMAS:  Oh, no.  'Cause I'm coming --

8     usually I have on a turtleneck that says security.

9     Usually --

10         MR. TILEM:  She asked you if this is your

11    uniform and you said --

12         MR. THOMAS:  Yes.  Oh, yes.

13         MR. TILEM:  -- yes.

14         MR. THOMAS:  This is -- yes.

15         HEARING OFFICER SHIELDS:  Well that's not a

16    uniform.

17         MR. THOMAS:  Okay.

18         HEARING OFFICER SHIELDS:  That's a navy

19    jacket.

20         MR. THOMAS:  Okay.

21         MR. TILEM:  Can you describe --

22         MR. THOMAS:  Okay.

23         HEARING OFFICER SHIELDS:  Well let me note

24    for the record, Mr. Thomas is wearing a navy jacket

25    that's piped in white.

PROCEEDINGS                                67

1          MR. THOMAS:  Well okay.  I'll rephrase that,

2     ma'am.

3          HEARING OFFICER SHIELDS:  So tell me --

4          MR. THOMAS:  This is not -- my uniform

5     jacket is like a security jacket.  It's like PD and

6     it has security on it.

7          MR. TILEM:  Okay.  Where does it say

8     security on your security jacket?

9          MR. THOMAS:  It'll say it like on the

10    collar.

11         MR. TILEM:  Okay.  And --

12         HEARING OFFICER SHIELDS:  It says security

13    period?  Does it say Taino --

14         MR. THOMAS:  Just -- no.  It doesn't say

15    Taino.  I have an ID on me that says who I am.  A

16    security director.

17         MR. TILEM:  And do you also have a badge?

18         MR. THOMAS:  Yes, sir.

19         MR. TILEM:  Okay.  And where do you wear

20    that?

21         MR. THOMAS:  I have -- I wear it around my

22    neck.

23         MR. TILEM:  Okay.  Do you have any other --

24    anything else on you -- the coat you wear indicates

25    that you're security?

PROCEEDINGS                                    68

1          MR. THOMAS:  Yes, my shirt.

2          MR. TILEM:  Your shirt?

3          MR. THOMAS:  Yes.

4          MR. TILEM:  Okay.  And where does your shirt

5     say security?

6          MR. THOMAS:  My shirt -- it's sometimes on

7     the sleeve.

8          MR. TILEM:  Okay.

9          MR. THOMAS:  We have patches on the sleeve.

10         MR. TILEM:  Okay.  Now so during the 17 year

11    period you said you went there three to four times a

12    week, correct?

13         MR. THOMAS:  That's correct.

14         MR. TILEM:  Okay.  And those three to four

15    times a week during those 17 years, did you -- you

16    said you went in uniform, correct?

17         MR. THOMAS:  That's correct.

18         MR. TILEM:  Did you wear your gun visible

19    during those three to four trips per week for 17

20    years?

21         MR. THOMAS:  Yes.

22         MR. TILEM:  Did anyone ever tell you that

23    you couldn't do that?

24         MR. THOMAS:  No.

25         MR. TILEM:  Okay.  When you go there three

1  to four times a week over 17 years, did you meet with

2  police officers?

3          MR. THOMAS:  I meet with police officers,

4  yes.

5          MR. TILEM:  Did you meet with detectives?

6          MR. THOMAS:  Detectives, that's correct.

7          MR. TILEM:  Did you meet with -- did you

8  ever meet with supervisors, sergeants, lieutenants?

9          MR. THOMAS:  Yes.  Yes, everyone that works

10  there.  Yes.

11          MR. TILEM:  Okay.  And did anyone ever tell

12  you you can't bring that gun in here?

13          MR. THOMAS:  No one never told me.

14          MR. TILEM:  Okay.  Now how far is it from

15  Taino Towers to the 25 Precinct?

16          MR. THOMAS:  Three or four blocks.

17          MR. TILEM:  How do you travel from Taino

18  Towers to the precinct during those three to four

19  times per week?

20          MR. THOMAS:  Walk.

21          MR. TILEM:  Do you have an office at Taino

22  Towers or is your main base I think on West 37th

23  Street?

24          MR. THOMAS:  Yes, on West 37th Street.

25          MR. TILEM:  Okay.  Do you have a place to

PROCEEDINGS                                                    70

1       secure your firearm at Taino Towers?

2                  MR. THOMAS:  Yes.

3                  MR. TILEM:  Okay.  And where is that?

4                  MR. THOMAS:  That's 2253.

5                  MR. TILEM:  Twenty-two --

6                  MR. THOMAS:  Fifty-three.  Third Avenue.

7                  MR. TILEM:  Third Avenue.

8                  MR. THOMAS:  Yes.  Fifty-three.

9                  MR. TILEM:  2253 Third Avenue.

10                 MR. THOMAS:  Yes.

11                 MR. TILEM:  And where is that?

12                 MR. THOMAS:  That's in the office.

13                 MR. TILEM:  In the office.

14                 MR. THOMAS:  Yeah.

15                 HEARING OFFICER SHIELDS:  So you don't

16      secure your firearm at A & M?

17                 MR. THOMAS:  No.  I take my firearm

18      [~~unintelligble~~] home [20:56].

19                 MR. TILEM:  Okay.  Now do you consider

20      attending these meetings at the 25 Precinct to be

21      part of your employment?

22                 MR. THOMAS:  Yes, sir.

23                 MR. TILEM:  Okay.  And what is your basis

24      for the belief that that is part of your employment?

25                 MR. THOMAS:  ~~Now~~ My basis to believe is just

PROCEEDINGS                                71

1     providing safety for myself and residents of the

2     community.

3                    MR. TILEM:  Okay.  Do you have a supervisor

4     at A & M Security?

5                    MR. THOMAS:  No.  I'm the main supervisor.

6                    MR. TILEM:  But you're the main supervisor —

7     —

8                    MR. THOMAS:  Yes.

9                    MR. TILEM:  -- at Taino Towers --

10                   MR. THOMAS:  Yes.

11                   MR. TILEM:  -- but who do you report to?

12                   MR. THOMAS:  Oh, no.  I report to the owner.

13    Bill Burgus.

14                   MR. TILEM:  Okay.  And what's his name?

15                   MR. THOMAS:  Bill Burgus.

16                   MR. TILEM:  Okay.

17                   HEARING OFFICER SHIELDS:  Bill?

18                   MR. THOMAS:  Burgus.

19                   MR. TILEM:  Vargas?

20                   MR. THOMAS:  Burgus.

21                   HEARING OFFICER SHIELDS:  Spell it?

22                   MR. THOMAS:  B-U-G-U-R-S.

23                   HEARING OFFICER SHIELDS:  B-U --

24                   MR. TILEM:  R-G --

25                   MR. THOMAS:  No.  B-U-R-G-U-S.  Burgus, yes.

PROCEEDINGS                                    72

1          HEARING OFFICER SHIELDS:  Burgus?

2          MR. THOMAS:  Yes.

3          MR. TILEM:  By the way, was he present with

4   you when you came in with Detective Cook?

5          MR. THOMAS:  Yes.

6          MR. TILEM:  With regard to this incident?

7          MR. THOMAS:  Yes.

8          MR. TILEM:  And --

9          HEARING OFFICER SHIELDS:  So he is the owner

10  of --

11         MR. THOMAS:  Yes, that's it.

12         MR. TILEM:  And is that who you report to

13  directly?

14         MR. THOMAS:  Yes.

15         MR. TILEM:  Now does he require that you

16  attend meetings at the 25 Precinct?

17         MR. THOMAS:  Yes.

18         MR. TILEM:  Now with regards to your duties

19  at Taino Towers, how many arrests have you assisted

20  in or participated in with regard to arresting anyone

21  at Taino Towers?

22         MR. THOMAS:  Thousands.

23         MR. TILEM:  And with regard to those

24  arrests, were you ever asked to come into the police

25  station to assist with the processing of those

PROCEEDINGS                              73

1      arrests?

2                  MR. THOMAS:  Yes.

3                  MR. TILEM:  How often does that happen?

4                  MR. THOMAS:  On the regular -- I'd say like

5      two -- six years ago when we were doing a lot of

6      shooting over there, probably every day.

7                  MR. TILEM:  Okay.  What about now or --

8                  MR. THOMAS:  No, occasionally.

9                  MR. TILEM:  And when you say occasionally,

10     we're talking once a week, once a month, or once a

11     year?

12                 MR. THOMAS:  Probably once a week.

13                 MR. TILEM:  Have you ever been convicted of

14     a crime?

15                 MR. THOMAS:  No.

16                 MR. TILEM:  Have you ever been falsely

17     arrested?

18                 MR. THOMAS:  Yes.

19                 MR. TILEM:  Okay.  And can you describe what

20     happened in that incident?

21                 MR. THOMAS:  Yes.  I was on my lunch break -

22     -

23                 HEARING OFFICER SHIELDS:  Okay.  And so how

24     is this relevant to this proceeding?

25                 MR. TILEM:  Well their -- one of the

PROCEEDINGS                                    74

1    allegations is that this false arrest was -- is in

2    part forming the basis for this recommendation of his

3    revocation.

4                    HEARING OFFICER SHIELDS:  What arrest is

5    this?

6                    MR. THOMAS:  2007.

7                    MR. TILEM:  2007.

8                    MR. THOMAS:  Yeah.

9                    HEARING OFFICER SHIELDS:  And you were

10   arrested for what?

11                   MR. THOMAS:  They were saying --

12                   HEARING OFFICER SHIELDS:  What were you

13   charged with?

14                   MR. THOMAS:  Possession of a firearm.

15                   HEARING OFFICER SHIELDS:  Okay.  Did you

16   have a permit at the time?

17                   MR. THOMAS:  Yes, ma'am.

18                   MR. TILEM:  Were the charges dismissed?

19                   MR. THOMAS:  Yes, sir.

20                   MR. TILEM:  By the way, did you show the

21   police, when you were arrested, your license?

22                   MR. THOMAS:  Yes.

23                   MR. TILEM:  And what did -- what did they

24   do?

25                   MR. THOMAS:  They told me I gotta go to the

PROCEEDINGS                                75

1        station and check it.

2                MR. TILEM:  Okay.  And what happened after

3        they took you to the station and checked it?

4                MR. THOMAS:  Then they took it to the

5        station they said that One Police Plaza gave me a

6        fake pistol license.

7                MR. TILEM:  And were you charged --

8                HEARING OFFICER SHIELDS:  Who said that?

9                MR. THOMAS:  Huh?  The arresting officer.

10               MR. TILEM:  And were you charged with

11       anything else other than criminal possession of a

12       weapon?

13               MR. THOMAS:  No.

14               MR. TILEM:  Just criminal possession of a

15       weapon?

16               MR. THOMAS:  Criminal possession of a

17       weapon.

18               MR. TILEM:  And those charges were

19       dismissed?

20               MR. THOMAS:  That's correct, sir.

21               MR. TILEM:  Okay.  Did you sue the police

22       department about that arrest?

23               MR. THOMAS:  Yes, I did.

24               MR. TILEM:  Okay.  And did you receive an

25       award for being falsely arrested?

1       MR. THOMAS:  Yes.

2       MR. TILEM:  Okay.  And that -- *was* is that more

3   than $10,000 you received?

4       MR. THOMAS:  Yes.

5       MR. TILEM:  I have nothing further.

6       DETECTIVE COOK:  Can I ask him a question?

7   Mr. Thomas --

8       HEARING OFFICER SHIELDS:  No.  You cannot

9   ask a question, but you can tell me if you think

10  there's something I should ask.

11      DETECTIVE COOK:  Okay.  I just wanted to

12  know if Mr. Thomas was a registered confidential

13  informant with the police department.

14      HEARING OFFICER SHIELDS:  Okay.  *Are you?*
    *That's very easy.*

15      MR. THOMAS:  No.  Because the reason --

16      HEARING OFFICER SHIELDS:  You're answering

17  me.                *Okay!*

18      MR. THOMAS:  No.  The reason I'm not doing
    *money*

19  it for my -- informants get paid to do that.  I don't

20  do it to get paid.

21      HEARING OFFICER SHIELDS:  Okay.  Yes or no?

22      MR. THOMAS:  ~~Yes.~~ *No.*

23      HEARING OFFICER SHIELDS:  Counsel, do you

24  want to sum up or rely on the record?  It's your

25  choice.

1        MR. TILEM:  I just briefly -- I want to just

2   recap some things here.  On the whole ~~I think of~~ *looking at* the

3   testimony here, the record of Mr. Thomas's history

4   with the police department, particularly the License

5   Division, but not exclusively the License Division,

6   there is a disturbing pattern.  We represented Mr.

7   Thomas in 2013 when the applications were made.  One

8   was granted and one was denied, and the applications

9   were made at the same time.  We contacted the License

10  --

11        HEARING OFFICER SHIELDS:  Was it the same

12  investigator?

13        MR. TILEM:  I would assume they were

14  different investigators because I believe one was

15  handled as a gun custodian and one was handled as a

16  carry guard.  I believe those ~~are~~ *went to* different sections.

17        HEARING OFFICER SHIELDS:  Well they're not

18  different sections.  So that's why I'm asking.

19        MR. TILEM:  So then -- so then I don't know.

20        HEARING OFFICER SHIELDS:  Mr. Thomas, do you

21  remember if you had two investigators or one?

22        MR. THOMAS:  It was one investigator.

23        MR. TILEM:  Now after we appealed that

24  decision to the License Division, of course, the

25  disapproval was reversed, and he was granted the

1   license.  There seems to be some kind of pattern here

2   that is disturbing in light of Mr. Thomas's lawsuit

3   against the police department.  The fact that he was

4   falsely arrested, and the police department seems to

5   have made *it* an admission in that case.  The truth of

6   the matter is and the simple facts here are that Mr.

7   Thomas is a guy who's worked in the 25 Precinct for

8   17 years.  Had licenses ~~over~~ *almost* all of that time to

9   carry -- to carry a firearm, and there's been no

10  incidences the way I would define them in the way

11  they would be defined in ~~the~~ *Webster's* dictionary.  They may be

12  ~~incidences~~ *incidents* the way the police department defines

13  them, but at the end of the day, he has not been

14  found to have violated any rule of New York City

15  Police Department of New York City.  He has not been

16  found to have violated any criminal act.  Any charges

17  that have been brought against him have been

18  dismissed.  He is a completely law abiding citizen

19  and even given the fact that -- even if there was an

20  allegation that was somehow substantiated that he

21  shouldn't carry his firearm into the precinct, the

22  circumstances under which the incident occurred,

23  certainly do not warrant the most draconian remedy of

24  revocation and in addition these incidences and the

25  suspension of his driver's license, the -- I'm sorry.

PROCEEDINGS                                        79

1      The suspension of his driver's license -- pistol

2      license and the revocation had an impact on Mr.

3      Thomas's livelihood and his ability to support his

4      family. So I ask that his license be reinstated.

5                  HEARING OFFICER SHIELDS:  Mr. Thomas, just a

6      quick question.  Does your employment require you to

7      have a firearm license?

8                  MR. THOMAS:  Yes, ma'am.

9                  HEARING OFFICER SHIELDS:  So if you don't

10     get it, will you lose that employment?

11                 MR. THOMAS:  Most likely, yeah.

12                 HEARING OFFICER SHIELDS:  Alright.  The time

13     is 2:43 p.m.  This hearing is concluded.  My decision

14     is reserved.

15                 MR. TILEM:  Thank you for patience today.

16                 HEARING OFFICER SHIELDS:  You will be

17     getting a written determination in the mail.  I'm

18     gonna turn off the recorder.

19                 [END OF HEARING]

20

21

22

23

24

25

80

CERTIFICATE OF ACCURACY

I, Julia Zappi, certify that the foregoing

transcript in the matter of Devon Thomas, Hearing

Index Number 45/16 on February 15, 2017 was

prepared using the required transcription equipment

and is a true and accurate record of the

proceedings.


Certified By


*Julia Zappi*

_____


Date: November 2, 2017




GENEVAWORLDWIDE, INC.

256 West 38th Street - 10th Floor

New York, NY 10018