



**POLICE DEPARTMENT**
License Division
Hearings & Appeals Section
One Police Plaza Room 110A
New York, NY 10038
Tel: (646) 610-5873, 5560
Fax: (646) 610-6399



Date: October 30, 2017

Mr. Devon Thomas
57 Joan Court
Elmont, NY 11003

                Re:     Devon Thomas
                        Permit(s) #CG2013000155, GD2013000427

### FINAL AGENCY DETERMINATION

Dear Mr. Thomas:

     As a result of an administrative hearing held on February 15, 2017, your Carry Guard and Gun Custodian handgun licenses have been REVOKED. A copy of the hearing report is enclosed.

     This determination concludes the Police Department's review of this matter. You may appeal this determination by commencing an Article 78 proceeding in Supreme Court within four months of the date of this letter.

                                                        Very truly yours,

                                                        Jonathan David
                                                      Director, License Division

Enclosure

c:
Peter Tilem, Esq.

Mr. Bill Burgos
A&M Professional Security Consulting Corp.

Peter Tilem, Esq.
Tilem & Associates, PC
188 East Post Road, 3rd floor
White Plains, NY 10601

Mr. Bill Burgos
A&M Professional Security Consulting Corp.
237 West 35th Street, Suite 505
New York, NY 10001

**POLICE DEPARTMENT**
**CITY OF NEW YORK**
**License Division**

------------------------------------- x
**In the Matter of the Application of**
:   **Hearing Index No. 45/16**
**DEVON THOMAS**
**License Nos. CG2013000155, GD2013000427[1]**   :   **CD-R Nos. 11, 12**

**For a hearing and determination pursuant to**   :
**Title 38 § 15 of the Rules of the City of New York**
------------------------------------- x

Licensee appeals from the September 1, 2016 determination of the commanding officer of the License Division which, after investigation, revoked his Carry Guard and Gun Custodian handgun licenses.

A hearing was held in the above-entitled matter on February 15, 2017 before Hearing Officer MARGARET L. SHIELDS, Esq. Applicant DEVON THOMAS appeared in person and by his attorney, PETER TILEM, Esq.,[2] and testified on his own behalf. Detective JOSEPH COOK testified for the License Division Incident Unit.

The issues presented herein, and the undersigned hearing officer's findings, are:

1. Do the facts and circumstances surrounding the licensee's incident cast doubt on his character and fitness to possess a firearms permit? *Yes.*

2. Did the licensee violate the rules and regulations governing his permit? *Yes.*

After listening to the testimony, reviewing the investigatory file, and considering all of the proofs, the undersigned makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. Licensee Devon Thomas, who holds both Carry Guard and Gun Custodian permits issued in 2013 in conjunction with his employment by A&M Security, was made an "incident" on 4-22-16 and his handgun permits suspended after it was reported to the License Division that Mr. Thomas had unnecessarily displayed his firearm in public on 4-21-16.

2. By notice dated 5-01-16, the licensee was informed that his pistol license had been suspended pending investigation of the incident. The notice directed him to "immediately":

---

[1] GD indicates Gun Custodian permit, erroneously referred to as GC2013000427 permit in some License Division correspondence.
[2] Present also was Robert Schechter Esq., also of the Tilem & Associates law firm.

1

- voucher any and all firearms at his local precinct;
- forward his license and a copy of the Property Clerk's Invoice showing surrender of the firearms to the License Division;
- provide a notarized letter to the License Division explaining the facts and circumstances of the incident;
- telephone and speak with the assigned investigator, Det. Cook; and,
- if arrested, provide a certificate of disposition from the court and (if applicable) a certificate of relief from disabilities.

The licensee was also informed of his right to a hearing by mail to appeal the suspension of his permit during the License Division's investigation; the record shows no such request was made. Mr. Thomas did not surrender his firearm until 7-12-16, more than 2 months after being directed to do so "immediately."

3. There are 2 firearms on Mr. Thomas's CG permit. License Division records shows that 1 firearm was transferred to the custody of the alternate gun custodian at A&M Security. The licensee's Glock 19mm handgun was confiscated and vouchered by Det. Cook on 7-12-16 at Police Headquarters under Property Clerk's Invoice 1000824382. Mr. Thomas surrendered his 2 permits to Det. Cook.

4. According to Det. Cook, the complaint about the licensee's 4-21-16 display of his firearm was made by the executive officer of the 25th Precinct, Captain Walsh,[3] who informed the License Division that she had been notified by the security team of the City Council Speaker that Mr. Thomas had been observed inside the 25th Precinct station house on that date wearing his firearm outside his clothing.

5. During a personal interview held at the License Division, Mr. Thomas (accompanied by his attorney Peter Tilem, Esq. and by his employer, Bill Burgos, owner of A&M) informed Det. Cook that on 7-21-16 he had decided to go to the 25th Precinct after work to say goodbye to Deputy Inspector Harnisch, who was retiring, and he didn't think he had done anything wrong.

6. The licensee had previously been accused of the same offense. On 6-20-14, police received a complaint of an armed civilian holding a Rangel sign during a political rally (held by supporters of candidates Rangel v. Espaillat) being held at the corner of 122nd Street and 3rd Avenue, in front of Taino Towers. Police officers from the 25th Precinct assigned to the rally identified the civilian in question as Mr. Thomas, and advised him not to display his firearm. These officers described him as wearing a holstered firearm outside his clothing, which consisted of cargo pants and tee shirt, with no visible insignia identifying him as working for Taino Towers security. The incident was reported to the License Division by the 25th Precinct patrol supervisor. The investigation into that incident was still open at the time of the 4-21-16 incident; both investigations were assigned to Det. Cook.

7. Det. Cook closed out his investigation on 8-15-16, recommending revocation of the licensee's permit. He noted that the licensee had more than once failed to follow the rules and regulations governing his permit by unnecessarily displaying his firearm in public. The

---

[3] Deputy Inspector Kathleen Walsh is currently the commanding officer of the 25th Precinct..

2

investigator also considered the licensee's prior criminal history and failure to notify the License Division of an earlier order of protection (OOP) as reasons to revoke.

8. The record shows the licensee's permit as having been "cancelled" in 1999, 2008, and 2011 after incidents. Det. Cook testified that he did not know why Mr. Thomas's permit was cancelled.

9. Det. Cook's superiors concurred with his recommendation. By notice of determination dated 9-01-16, the commanding officer revoked the licensee's Carry Guard and Gun Custodian licenses, citing:
- The facts and circumstances surrounding your incident on 04/21/2016 for failure to follow rules of the License Division (Title 38);
- Failure to notify the License Division that you were the recipient of a criminal court summons and that an order of protection was issued against you;
- Your history of arrests and incidents;
- Your failure to abide by the Rules and Regulations governing your firearms licenses.

The notice also advised the licensee that he could challenge the determination by timely requesting (within 30 days) an administrative hearing. The licensee did so via affidavit, sworn to on 9-20-16.

10. The licensee made no request under 38 RCNY § 15-25[b] for a copy of the file.

Testimony of Detective Joseph Cook:

11. Det. Cook admitted that he did not have a copy of the OOP in his file and was unaware whether it had been issued ex parte or if the licensee had been present in court for its issuance. The investigator testified that eJustice computer checks showed that the OOP had been issued against the licensee after a domestic incident with his wife. Under cross-examination by counsel, the detective admitted that he could not certify that the OOP had been issued but he believed the computer record was accurate. He said his belief was supported by the fact that the person against whom the order was issued bore the same name, date of birth, and other identifying factors as the licensee Devon Thomas. He agreed that the OOP had subsequently expired and that there was no current OOP against Mr. Thomas. Det. Cook denied knowing that the licensee's 2007 arrest had resulted in a substantial monetary settlement to the licensee, whom counsel said had sued the City for wrongful arrest.

Testimony of Licensee Devon Thomas:

12. At hearing, Mr. Thomas testified that he resides at 57 Joan Court, Elmont, NY 11003, where he has lived for the past 12 years. He has worked at Taino Towers, a 4-building complex located between 2nd and 3rd Avenues and 122nd-123rd Streets in Manhattan, for the past 17 years. He said his employer is A&M Security.

13. The licensee denied that he had ever been the subject of any Order of Protection (OOP). He stated positively that he was unaware that any OOP had ever been issued against him. He was equally certain that he had never been served with an OOP.

3

14. Questioned about the prior arrest history cited by Det. Cook, Mr. Thomas said that he was wrongfully arrested in 2007 for CPW despite the fact that he possessed a valid pistol permit. He said he sued the NYPD for wrongful arrest and won a monetary award of over $10,000.

15. Mr. Thomas said that he has possessed a permit since 2002, then added that it has been since 1995 or 1996. He said he was unaware that it had ever been cancelled because he was never required to re-apply. He admitted that he did re-apply for the current CG and GC permits. [The record shows that he applied for both permits in 2013; his Gun Custodian permit application was approved and his Carry Guard application, first denied, was approved on appeal to the License Division Director.]

16. In discussing the 2016 incident where he was reported to have been observed with his firearm exposed inside the 25th Precinct station house, the licensee testified that he considers his frequent visits to the 25th Precinct to be part of his carry-guard duties at Taino Towers. Mr. Thomas related that he has assisted in "thousands" of arrests at the 25th Precinct during the course of his 17 years at Taino Towers. He claimed to have worked with all the units in the 25th Precinct, including "Gang Intel," and to be personally responsible for 30% of their arrests. Describing his work, he said he goes to the precinct on a daily basis and works with all shifts to help decrease crime. "I help them with information resources. I see things they don't see." He said he also goes to the station house to look at line-ups. Pressed by the hearing officer to explain the reason for his presence at line-ups, he qualified that he views line-ups only when requested to do so. Asked if he worked in uniform or civilian clothes, the licensee replied that 99% of the time he is in uniform.

17. Because his CG permit allows him to carry his firearm only while engaged in guard duties, and to and from that employment and his home, the hearing officer asked why he carried his firearm into the 25th Precinct station house, especially to a retirement party. His response was that he goes to every meeting of the precinct community council at the 25th Precinct. "That day I went to speak to Gang Intel." He said that carrying his firearm inside the station house had never been a problem.

18. During cross-examination by counsel, the licensee admitted that while he used to go to the 25th Precinct daily, he now goes there on business 3-4 times a week. He noted that the station house is about 3 blocks from Taino Towers, and he walks to/from there and in uniform. When counsel asked if he was wearing a complete uniform now, Mr. Thomas replied in the affirmative. At this point the hearing officer noted on the record that the licensee was wearing a plain navy jacket with no visible uniform insignia. The licensee responded that he has a badge which he wears around his neck that says "Security" and a turtleneck that also says "Security," "like on the collar, and sometimes on the sleeve," and this is what he wears on duty. He said he has met with all ranks at the 25th Precinct while carrying his firearm, and no one ever told him not to carry his firearm in the station house. He explained that he carried his firearm there "to provide for the safety of myself and residents." He indicated that he is an easy target in the neighborhood due to his frequent cooperation with the 25th Precinct.

19. Mr. Thomas testified that he does not store his firearm at A&M when off-duty, but travels with it to and from Taino Towers and his residence. When asked where his firearm is stored, in the A&M office or Taino, the licensee responded that it was stored in the office. On further questioning by counsel, Mr. Thomas acknowledged that there was a secure place at Taino where he could store his firearm while off-duty.

20. Counsel asked if A&M owner Bill Burgos required him to attend meetings at the 25th Precinct; Mr. Thomas's answer is unintelligible on the recording of the hearing, but the undersigned hearing officer believes it was "Yes." Mr. Thomas explained that having assisted with thousands of arrests, he was required to come into the station house to assist with those arrests. When counsel asked how often this occurred, the licensee said that 6 years ago it was every day, but now only "occasionally." Counsel asked him be more specific, and he responded "once a week."

21. Mr. Thomas denied having been a police confidential informant [CI] and said he was never paid for his assistance to the police.

22. Asked by the hearing officer if his employment required him to carry a firearm, the licensee replied "Yes." Asked more specifically if he would lose that employment if he lost his firearm, he replied, "Most likely."

23. In summary, counsel opined that there was a disturbing pattern in the licensee's history with the NYPD and especially the License Division. He cited in support the fact that the licensee's 20012 application for 1 permit was approved while the 2nd application was initially denied and approved only after appeal. Mr. Tilem suggested that this disturbing pattern may stem from the licensee's 2007 arrest and subsequent lawsuit for false arrest. He argued that the licensee was a completely-law-abiding citizen, had worked in the 25th Precinct for 17 years without any real incidents, and that during this period had not violated the rules governing his permit. He concluded that the licensee's carrying his firearm into the precinct, even if against the rules, should not incur the draconian penalty of revocation.

## CONCLUSIONS OF LAW

1. The licensee's carry-guard permit is restricted to the days and hours that the licensee is actually engaged in employment or when traveling from his/her residence to employment or from employment to residence. These restrictions shall be strictly interpreted by the New York City Police Department and violation of these rules shall result in the immediate suspension of the pistol license. (38 RCNY § 5-24[b]) No detours for any personal business or other activity are permitted; e.g. a CG licensee is not allowed to stop on his/her way home to go shopping. The credible evidence adduced at hearing is that Mr. Thomas has routinely exceeded the limitations of his permit by carrying his firearm, whether actually engaged in guard duties at Taino Towers or not. When Mr. Taino was observed carrying a Rangel sign at the 6-20-14 political rally, he was clearly not engaged in his employment duties. By his own admission he carried his firearm to/from his workplace and the 25th Precinct for his personal protection. The rules governing his permit limit his carrying to/from his residence and workplace, and only at those times he is

5

actually engaged in the employment for which the permit was issued. At all other times, the firearm is to be safely secured, unloaded with the ammunition stored separately, under specified conditions. The vagueness of the licensee's testimony regarding where he secures his firearm when he is not on-duty suggests that he does not secure it except at home and carries it not only to/from work and home, but at any place in between, not limited to Taino Towers, and including a precinct retirement party and a political rally.

2. Additionally, the licensee has carried his firearm publicly displayed outside his clothing. The licensee's permit is clearly marked in bold-faced capital letters:
**RESTRICTED CONCEALED CARRY HANDGUN LICENSE**
This means that the firearm is to be carried concealed and not visible to the public. Mr. Thomas's handgun should have been carried in a holster worn inside his clothing and not visible to the public. Additionally, the record shows that he was warned in 2014 by 25th Precinct officers not to carry his firearm visibly exposed.

3. In fairness to Mr. Thomas, I take administrative notice that the "concealment" provisions regarding carry guard firearms are poorly written in Title 38, and the "concealed" requirement is not enforced when a legally-armed guard is on duty in full uniform with his/her firearm carried in a holster worn outside and part of that uniform. That Mr. Thomas was aware of that unwritten "uniform" exemption is evidenced by his untruthful testimony that he was always, or 99% of the time, in uniform when he was carrying his firearm.

4. Credibility is for the hearing officer to determine. *Lackow v. Dept. of Education*, 51 A.D.2d 563 (1st Dept. 2008] citing *Berenhaus v. Ward*, 70 N.Y.2d 436, 443 (1987), *Iacono v. Police Department*, 204 A.D.2d 225, 612 N.Y.S.2d 401 [1st Dept. 1994] I find Mr. Thomas's testimony not credible. His exaggerated claims of assistance provided to the 25th Precinct (which, even if true, are not germane to the issue of whether he violated the limitations of his CG handgun license) are uncorroborated by any witness or documentary testimony from that precinct's command. His testimony regarding his wearing his security uniform 99% of the time is also uncorroborated by witness or documentary testimony, and was contradicted by himself and by statements made by police officers assigned to the 2014 rally, who described Thomas as wearing civilian clothes and his firearm in a holster outside those civilian clothes. He testified in the within hearing that he was presently wearing his work uniform. This testimony was patently untruthful, because he was observed by the undersigned hearing officer to be wearing at the time a plain navy jacket and no visible uniform insignia. His vagueness in describing what his uniform consists of suggests that he is never in uniform. Additionally, Mr. Thomas's description of his "uniform" does not conform to the requirements set by the NYS licensing authority, which requires that the insignia used by security guards "shall show the full licensed name of the employer in a prominent and legible manner" in addition to containing the words "watch guard, guard, patrol, special services protection, security or armed security." These insignia are to be on a cloth patch or metal insignia worn either on the shoulder or breast of the guard uniform or uniform hat.[4] From Mr. Thomas's vagueness in describing his "uniform" and apparent

---

[4] Private Investigators, Bail Enforcement Agents and Watch Guard or Patrol Agencies License Law §170.10 Insignia/symbols of authority, Article 7, General Business Law.

ignorance of what such uniform should consist of, I conclude that his testimony that he was working in uniform when carrying his firearm was deliberately untruthful.

5. The licensee also testified that he was unaware that he had ever been the subject of an order of protection and had never been served with an order of protection. A review of the file shows that on his two 2013 applications, he stated that he had never been the subject or object of an order of protection. Conversely, on his renewal application, sworn to on 01/14/16, he answered "yes" to the same question. My review of the file shows that the eJustice search results printed out by Det. Cook include details in addition to those provided by the investigator during his testimony in the within hearing: *A Criminal Court OOP was issued on 5-01-2011 against Devon Thomas, prohibiting his possession/purchase of firearms. Sandra Thomas is the protected person. Originating agency is the Nassau County Police Department in Mineola. The order expired or was dismissed on 6-15-2011.*

6. Although no testimony was taken regarding the licensee's Nassau County handgun license, the record shows that Mr. Thomas's NYC permit was cancelled in 2008 due to his move from New York City to Elmont, in Nassau County, and his records were sent to Nassau County. The NYS Division of Criminal Justice Services notified the License Division that Mr. Thomas applied on 2-15-2008 to the Nassau County P.D. for a pistol license, which was granted on by them on 11-10-2009. The license no. is HG501632008 and is referenced on Mr. Thomas's NYC renewal application. The file additionally contains details from the Nassau County P.D. concerning that permit, which was suspended by Nassau County P.D. after the licensee's 4-30-2011 domestic incident with his wife, who took out an OOP after the incident. The Criminal Court OOP expires 4-30-12. The criminal case was dismissed 6-15-2011 and the permit reinstated on 11-9-2011.[5] Mr. Thomas's denials that he had ever been the subject of an OOP, and that he was aware of any such order, defy belief. I conclude that he knowingly and deliberately gave false testimony in the within hearing.

7. It is well established that although past criminal charges may have been dismissed, the License Division may consider the circumstance surrounding the arrests in determining an applicant's suitability for a gun permit. (*Matter of Ostrowski v. City of New York*, 55 A.D.3d 471, 472 (1st Dept. 2008); *Matter of Servedio v. Bratton*, 268 A.D.2d 356 (1st Dept. 2000). Det. Cook's investigatory report lists the following previous incidents:

- 4-21-16 failure to follow rules and regulations (current incident);
- 6-20-14 failure to follow rules and regulations (gun exposed); continued without suspension.
- 5-6-11 permit cancelled after 5-6-11 arrest for criminal mischief;
- 5-1-11 failure to notify License Division of OOP against him;
- 4-10-08 permit cancelled after 4-10-08 arrest for CPW;
- 9-25-07 failure to notify License Division of Criminal Court summons for discon;
- 11-19-99 permit cancelled after arrest on a warrant

---

[5] The printout also notes that Nassau County again suspended the licensee's permit on 2-17-17 due to the suspension of the licensee's NYPD-issued handgun permit, and will remain suspended pending the outcome of the NYC license.

7

8. I make no finding about the 1999, 2008, and 2011 arrests. The License Division files for those periods are unavailable, being either missing or having been routinely destroyed. Additionally, the record before me shows that such information of these arrests as was available in the License Division files in 2013 appears to have been carefully considered by the License Division director, who approved the issuance of Mr. Thomas's current CG permit after appeal. In his 2013 approval of the CG permit, the director noted that Mr. Thomas's prior arrests had all been dismissed and sealed and he had received a judgment against the City as a result of the 2007 arrest. Far from discriminating against the licensee for his unlawful-arrest lawsuit, both the New Applications and the Incident investigators were apparently unaware of the result of the City's monetary settlement with the licensee stemming from his 2007 arrest.

9. The terms and conditions of issuance of pistol permits require that a licensee promptly surrender his/her firearms (38 RCNY §§ 5-30[f][g]) and permit (38 RCNY § 5-22[a][5]) when directed. The record shows that the licensee was directed in writing on 5-2-16 to "immediately" voucher his firearms at his local precinct. He did not do so until July 12, 2016, when his firearm was confiscated by Det. Cook.

10. The licensee is required to familiarize himself with the rules and regulations concerning his pistol permit. (38 RCNY § 5-33) Any misuse of purpose for which the license was issued or any action or misconduct on the part of the licensee which may constitute just cause, will result in the suspension or revocation of the license. (38 RCNY § 5-24[b][5]) The licensee has violated the major restrictions of his Carry Guard permit, treating it as though it were an Unlimited Carry permit, and has falsely testified about that conduct in the within hearing. He also failed to voucher his firearms when directed.

11. An applicant for a pistol permit must be of "good moral character" PL § 400.00[1]) and no good cause must exist to deny the applicant a license. (38 RCNY §§5-02, 5-10) The credible evidence adduced at hearing supports the revocation of Mr. Thomas's permits. He engaged in a pattern of exceeding the major restrictions of his Carry Guard permit by carrying his firearm when not engaged in guard duties, and by carrying his firearm exposed to public view (while out of uniform and wearing civilian clothes), did not voucher his firearm when directed, and provided false testimony in the within hearing—all of which provide sufficient good cause to revoke his permits. I reject counsel's argument that the licensee's conduct does not merit the draconian penalty of revocation. Had the licensee testified truthfully in the within hearing, I would have considered the lesser penalty of suspension.

12. In an administrative hearing, the burden of proof is on the applicant. *Matter of Zolzer v. NYS Comptroller*, 196 A.D.2d 934, 601 N.Y.S.2d 979 [3d Dept 1993]; City Administrative Procedure Act [CAPA], 45 NYC Charter § 1046[c][2]) For the reasons stated above I find that the licensee has not met his burden of showing that his permits should not be revoked.

**HEARING OFFICER'S RECOMMENDATION**

Based on the foregoing findings of fact and conclusions of law, it is hereby recommended that the Carry Guard and Gun Custodian handgun licenses of DEVON THOMAS be REVOKED.

Date:   October 23, 2017

_____
Margaret L. Shields, Esq.
Hearing Officer/City Administrative Law Judge


**FINAL AGENCY DETERMINATION**

I agree with the Hearing Officer's recommended decision.

Date:  10/27/17

_____
Jonathan David
Director, License Division